# ELIZABETH H. FARRELL *vs.* WILLIAM N. BEAN.

A written contract may be impeached for fraud by *parol evidence*, and when fraud is charged, and there is proof of circumstances occurring at the time of the contract, or subsequently, tending to sustain the charge, negotiations or transactions *prior* to the contract, having a similar tendency, may be given in evidence.

A written *receipt* purporting to be in full for a negro slave, accompanied with delivery of possession, was, in this case, upon parol proof, held to be a *mortgage*, and not an absolute *sale* of the negro.

A court of equity will, upon *parol proof* of fraud, mistake or surprise, rectify and reform the *written* agreements of parties, and consider an *absolute deed* as a *mortgage*, and the statute of frauds is no defence to such an equity.

When no particular time of payment is limited in a mortgage it is to be paid in a *reasonable time*, and if the payment is not so made the mortgagee is entitled to a foreclosure.

APPEAL from the Equity Side of the Circuit Court for Charles county.

The bill in this case was filed by the appellant against the appellee, to compel the delivery of a negro boy to the complainant, whom the bill alleges she had *mortgaged* to the defendant, on payment of the mortgage debt. The defence was that the boy was *sold* and delivered to the defendant by an absolute *sale*. The allegations of the bill and answer, and all the proof in the case, are fully stated in the opinion of this court. The court below, (CRAIN, J.,) passed a decree dismissing the bill, from which the complainant appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON and MASON, J.

Farrell *vs.* Bean.

*Alex. B. Hagner* and *Alex. Randall* for the appellant, argued for a reversal of the decree:

1st. Because the original agreement of the parties was, that this negro boy should be *mortgaged* to secure to the defendant the debts stated in the proof; and that it was by the fraud of the defendant, in taking advantage of an ignorant and illiterate woman who confided in him, that the receipt was drawn and executed by her, she believing his statement that it would have the same effect as a mortgage, and that a court of equity will consider and treat it as a mortgage. 6 *G. & J.*, 54, *Joice vs. Taylor. Ibid.*, 275, *Dougherty vs. McColgan.* 3 *Md. Ch. Dec.*, 138, *Davis vs. Banks. Ibid.*, 508, *Bank of Westminster vs. Whyte. Ibid.*, 521, *Ing vs. Brown, et al.* 4 *Johns. Ch. Rep.*, 167, *Strong vs. Stewart. Ibid.*, 144, *Keisselbrack vs. Livingston.* 7 *Do.*, 40, *Henry vs. Davis.* 2 *Md. Rep.*, 35, *McElderry vs. Shipley.* 2 *Call*, 354, *Robertson vs. Campbell.* 1 *Murphy*, 116, *Wilcox vs, Morris.*

2nd. That the statute of frauds does not interfere or prevent the remedy sought by the bill, because the contract was not executed as intended, by the fraudulent conduct of the defendant. 10 *G. & J.*, 404, *Jones vs. Hardesty.* 8 *Do.*, 93, *Savings Institution vs. Schroeder.* 11 *Do.*, 314, *Moale vs. Buchanan.* 4 *Md. Rep.*, 476, *Ellicott vs. Peterson.* 1 *Gill*, 90, *Wolfe vs. Hauver.* 9 *Do.*, 32, *Shepherd vs. Bevin, et al.*

*Frank H. Stockett* for the appellee, argued for an affirmance:

1st. Because there is no evidence in the case sufficient to justify the court in setting aside the written contract of the parties in relation to the *sale* of the boy. The bill could not be sustained, supposing it to have been for a *specific performance.* 2 *Johns. Ch. Rep.*, 585, *Gillespie vs. Moon.* 11 *G. & J.*, 314, *Moale vs. Buchanan.* 1 *Md. Ch. Dec.*, 348, *Beard vs. Linthicum.* 1 *Johns. Ch. Rep.*, 131, *Phillips vs. Thompson. Ibid.*, 273, *Parkhurst vs. Van Cortlandt. Ibid.*, 373, *Bendict vs. Lynch.* 4 *Kent's Com.*, 451. 2 *Story's Eq.*, sec. 764. 1 *Md. Ch. Dec.*, 120, *Owings vs. Baldwin, et al. Ibid.*, 196, *Waters vs. Waters.* 1 *Sch. & Lef.*, 18, *Lawrenson vs. Butler.*

2nd. Because there is no sufficient evidence to satisfy the court that there was any fraud in the agreement or terms of sale on the part of the defendant, or that he ever understood or agreed that he held the negro only as a security, or by any other title than that of purchaser *bona fide.* 9 *Ves.*, 246, *Coles vs. Trecothick.* 1 *Md. Ch. Dec.*, 349. *Ibid.*, 320, *Williams vs. Savage Manf. Co.* 1 *Johns. Ch. Rep.*, 370, *Bendict vs. Lynch.*

3rd. Because there is no evidence of any such mistake of law or fact on the part of the complainant, as to the terms of the sale of the boy, as to authorise this court to grant her the relief asked for. 1 *Story's Eq.*, secs. 111, 114. 1 *Pet.*, 1, *Hunt vs. Rousmaniere.* 8 *Md. Rep.*, 427, *Anderson vs. Tydings.* 2 *Do.*, 35, *McElderry vs. Shipley.*

4th. Because even had there been any such promise or understanding on his part, it being only by parol, is void by the statute of frauds pleaded and relied on in this case; and parol evidence is not admissible to add to or contradict a written instrument, except to show fraud; and whenever a parol agreement is afterwards reduced to writing, the latter *merges* all previous parol agreements. *Roberts on Frauds*, 79, 81. 6 *H. & J.*, 24, *Wesley vs. Thomas.* *Ibid.*, 435, *Watkins vs. Stockett.* 4 *Do.*, 278, *Howard vs. Rogers.* 1 *Johns. Ch. Rep.*, 273, *Parkhurst vs. Van Cortlandt.*

Eccleston, J., delivered the opinion of this court.

The bill in this case was filed in September 1852, by the appellant against the appellee. It alleges that the former was indebted to the latter, in 1846, in the sum of $151, the indebtedness consisting of $50 cash lent, and a judgment for $101, due to Bean by a certain Smith Turner, which the complainant had agreed to pay; that being so indebted she agreed with Bean to give him a lien therefor upon a negro boy of her's, she delivering possession of the boy, but retaining the right to redeem him by the payment of the said sum of $151, when able to do so, or when demanded in a reasonable time. That when the agreement was being consummated Bean stated that he did not know how to write a mortgage, but that a receipt

would do as well, and would answer the same purpose; that the complainant placed implicit confidence in the knowledge and statement of the defendant; and in furtherance only of the agreement as stated, she signed some instrument of writing in reference to the boy, which writing was given to the defendant, and at the same time possession of the boy was delivered to him for the purpose aforesaid, and he still continues to hold him. The bill also alleges, that "the complainant believing the whole transaction had been conducted as agreed upon, remained easy in reference thereto, and several times, either in person or by an agent, called upon the said Bean to know if he wanted the aforesaid sum of money, he replying that he did not then want money, and so the affair continued until in the early part of the year 1852;" at which time the complainant sent an agent to pay off the lien or mortgage upon the boy and to redeem him; that then for the first time, to the knowledge of the complainant, Bean claimed the boy as his own, and refused to allow him to be redeemed.

The bill reasserts that the boy was delivered to the defendant to secure the payment of the aforesaid sum of $151; and alleges that if he "has any paper or instrument of writing showing that said negro belongs to him, and the said title to said negro is derived from this complainant, that it is fraud upon this complainant and contrary to equity and good conscience."

The prayer of the bill is, that the defendant may be decreed to deliver the negro boy Tom to the complainant, upon the payment of the aforesaid lien, and that she may have such other and further relief in the premises as her case may require.

The defendant in his answer says, that on or about the 13th of March 1846, William Turner, the brother of the complainant, professing to act as her agent, called upon the respondent, and proposed that he should buy the negro boy mentioned in the bill of complaint, the said Turner, either then or afterwards saying, Mrs. Farrell did not want to sell the negro to a trader. That after the proposition thus made the respondent went over to see the boy, and, on the 13th of March 1846, agreed with the complainant to purchase him, at and for the sum of $225. That the complainant agreed to receive in part payment two

Farrell vs. Bean.

judgments which the respondent held against Smith Turner, a brother of the complainant, and the respondent then and there assigned them to her, the judgments then amounting to the sum of $125.71; and also paid, in cash, $77.26. The balance, by agreement, was paid in goods from the store of the respondent, who was then a merchant.

The answer positively avers the sale was absolute and *bona fide;* that the whole price has long since been paid, and that the complainant gave a receipt for the same. He denies having told the complainant he did not know how to write a mortgage, but that a receipt would answer the same purpose.

The answer asserts that the boy was delivered, on the 13th of March 1846, to the respondent, who has held possession of him, using and claiming him as his own, ever since. And it denies that the receipt is a fraud, but, on the contrary, it insists that instrument was executed by the complainant, with a full knowledge of its force and effect as well as the contents thereof. And the respondent denies having practiced fraud or deceit upon the complainant in any manner. He also denies that from the time of the sale up to the year 1852, Mrs. Farrell, either in person or by agent, ever called upon him to redeem the boy, or to know whether he (the respondent) wanted the money. He says, that in 1852 Smith Turner called on him and asked him if he was willing to take the money he paid and give up the boy, to which the respondent answered he was not. The inquiry was made as stated, but Turner did not actually tender or offer any money.

The answer further states, that after the sale the respondent, told the complainant if in a short time from the sale she would make out, and pay back to him the $225, she might have the boy again if she wanted him: or in other words, he would sell the boy to her for that price; but that this was a mere gratui-tous promise on the part of the respondent, not constituting any part of the agreement of the sale, and was made only as a matter of favor to the complainant, after the sale had been entirely consummated. That the complainant did not, within a short or reasonable time after said promise, "either in person or by agent, call upon the respondent to fulfill said promise,"

And the answer further states, "that no note or memorandum in writing was made by this respondent or any agent of his of the agreement on his part to let the said complainant have the boy back again, and he therefore pleads in bar the statute of frauds to so much of the complainant's bill as seeks relief for and on account of such parol agreement."

The bill was filed since the act of 1852, ch. 133, and the answer not having been required under oath, or read by the complainant as evidence, at the hearing, it is not to be regarded as evidence. The decision of the cause must therefore depend upon the proof.

The receipt given by the complainant is as follows:

"Received, this thirteenth day of March, eighteen hundred and forty-six, of William N. Bean, two hundred and twenty-five dollars, in full for my servants. Tom, supposed to be about twelve years of age, which I warrant and defend to the said Bean.          ELIZABETH H. ⋈ FARRELL.

Test,—*Smith Turner, John T. Davis.*"

As a witness on the part of the complainant, Smith Turner says, that in 1846, in consequence of what his brother Wm. A. Turner told him, he went to see Mr. Bean, and asked him whether he would take a mortgage on the boy of Mrs. Farrell's, for a judgment of $101, against him (the witness) and the loan of $50 to Mrs. Farrell. The defendant consented to do so, and said he would come over to Mrs. Farrell's in two or three days and bring the mortgage with him. He did come as he promised, but said he had not the mortgage; he had no form to write one by, and without a form he could not draw up one properly; it was a long instrument, and a receipt would do as well. Mrs. Farrell remarked, if you should want your money, and I have not got it, I suppose the boy will have to be sold; he said yes, but I shall not push you for I am not in want of money. He then commenced drawing the receipt, and whilst writing he told Mrs. Farrell, a certain sum must be mentioned in it, and asked what it should be? should it be $225? She said she supposed that amount would do as well as any other. The receipt was drawn with that sum in it, and Mrs. Farrell signed it. Bean took the boy home with

him, and the day after, the witness hired him from Bean at $15 for the balance of the year.

To a question, what was the true amount for which the boy was transferred to the defendant? the witness says, it was the judgment that Mrs. Farrell paid for him, and the $50 lent to her, making in all the sum of $151.

This witness also says, that at the request of the complainant he called at the end of the year 1846 to see the defendant, to know if he wanted his money, whose reply was, he could do without it, he was not pushed for money. And to a similar inquiry at the end of every year for three years he made the same reply. In 1852 the witness carried the money to the defendant and he refused to accept it, saying the boy was his and he intended to hold him.

Being asked, on cross-examination, who was present at the conversation between Mrs. Farrell and Mr. Bean, referred to by the witness, he says, Mrs. Farrell, Mr. Bean and myself, and no one else.

When he called in 1846, he had not the money with him. He never offered to pay the money until 1852, but then he told the defendant he had the money.

Spalding C. Moore, a witness for the complainant testifies, that when the boy was conveyed, he was a constable, and had a judgment against Smith Turner. The witness says, "I thought the only chance to get my money was to go to Mr. Bean and pay off the mortgage, get possession of the boy, sell him and get my money. I did go to see him and told him that I would pay off the mortgage if he would give me possession of the boy, and he replied, that he could not do it without the consent of Mrs. Farrell, but all that he wanted was his money, but could not do it without her consent. This conversation was in 1846."

Wm. A. Turner, (a brother of the complainant,) being examined as a witness for her, testifies, that in February or March 1846, he went, at the request of Mrs. Farrell and Smith Turner, to see Mr. Bean, to know if he would advance fifty or sixty dollars and take the boy in possession, until they could redeem him, and also take him as security for some

judgments which he held against Smith Turner.   The defend-
ant said he would see them.   This conversation was a few
days previous to the transfer.

Some two or three years afterwards, whilst talking about
the boy, Mr. Bean asked this witness if he thought the money
would be raised to redeem him.   The witness replied, he
thought it probable they would settle, if they could raise the
money.   Mr. Bean then said, he wished they would settle; it
was property he did not like to have, and would rather have
the money than hold the boy.   The witness understood the
conversation as alluding to Mrs. Farrell and Smith Turner.

On further examination of Smith Turner by the complain-
ant, the following additional interrogatories were propounded,
and answered:

"*Interrogatory 1st.*  You stated in your examination on the
9th, that the boy Tom, mentioned by you, was transferred to
Mr. Bean by Mrs. Farrell, to secure in part a judgment
against you of $101.   Have you since been able to refresh
your memory, and was it or not to secure two judgments of
that aggregate amount?

*Answer.*   It was to secure two—there were two.

*Interrogatory 2nd.*   Are these judgments now shown you
marked A. and B., the judgments referred to?

*Answer.*   Yes, they are the two judgments.

*Interrogatory 3rd.*   In whose hand-writing is the assignment
upon these judgments, and the calculation of the amounts due
15th March 1846?

*Answer.*   Mr. Bean—he assigned them in my presence."

Copies of the judgments are then set out in the record, with
a statement of the principal, costs and interest upon each, and
an assignment on each from the defendant to the complain-
ant, dated the 15th of March 1846.   The principal of one
is $61.08, and of the other $40.08, making together $101.16.
The costs and interest on both, up to the 15th of March 1846,
being added, the whole amounted on that day to $125.70.

After setting forth the judgments the record shows, that on
behalf of the defendant, further cross-interrogatories were pro-
pounded to Smith Turner, which were answered as follows:

"*Interrogatory.* Was this $50 you have spoken of paid at the time the receipt was executed?

*Answer.* Yes.

*Interrogatory.* Was this $50 all the money paid by Mr. Bean to Mrs. Farrell, on account of this boy Tom?

*Answer.* It was all the money paid at that time, and all that I know of. The money was a single $50 note.

*Interrogatory.* Did Mrs. Farrell, at the time of the transfer give Mr. Bean any note for the money which you say was paid by Bean to her?

*Answer.* No, she did not give any in my presence.

*Interrogatory.* Have these judgments been in the possession of Mrs. Farrell ever since the assignment?

*Answer.* Yes, they have been in her possession until they were sent down to Mr. Brent, so far as I know.

*Interrogatory.* Did you not get $16, from Mr. Bean some few days after the assignment, to go as the other $50?

*Answer.* I now recollect, being reminded of it, I did; it was to be a further lien for that amount upon the negro boy. I should have mentioned it in my first examination, had I recollected it at the time.

*Interrogatory.* Did you attest the receipt you have spoken of as a witness?

*Answer.* I am not certain whether I did sign it as a witness or not.

*Interrogatory.* Did you read the receipt?

*Answer.* I did.

*Interrogatory.* Do you recollect the contents of said receipt?

*Answer.* Not all. But I think I recollect a part, to wit: Received from Mr. Bean the sum of two hundred and twenty-five dollars, it being in payment in full of a negro boy Tom. There is something else, but what it is I do not now recollect."

John T. Davis, whose name appears upon the receipt as a witness, was examined on the part of the defendant, and says the name is his signature; that Mrs. Farrell affixed her mark to the receipt in his presence; and he attested it in her presence, at the time it was executed by her. Prior to its execution, the paper was read over to her by Mr. Bean. This wit-

ness went over, on that occasion, to Mrs. Farrell's with Mr. Bean, and remained there all the time he was there, and returned home with him.

Being asked whether he did or did not remain in the house and with Mr. Bean and Mrs. Farrell all the time Mr. Bean remained there? and to state how long Mr. Bean was there, the witness says: "As well as I recollect, I have no knowledge of being out of the house, and if I remained in the house all the time, I was with Mr. Bean and Mrs. Farrell, as we were all in the same room. I cannot say exactly how long Mr. Bean remained there. I suppose about half an hour or one hour; it might be more or it might be less."

He says he was present at the purchase of the negro, as he understood it, at the price mentioned in the receipt, or paper marked X. There was $50 paid in his presence and two judgments were assigned, the amount of which he does not recollect. Mr. Bean remarked that he did not wish to buy negroes, and if they would pay him his money they could take the boy. There was no reply to this that the witness recollects of, and as well as he remembers, Mr. Bean said this after the execution of the receipt, and just before Mr. Bean and the witness left. The boy was delivered to Mr. Bean, with whom it appears this witness was then living as a hired laborer, and he took the boy home and put him to work.

To a question, whether any thing was said about a mortgage at that time, by either party? Davis says: "There was nothing said at that time about a mortgage."

He was asked whether the transfer of the boy was not an absolute sale? and he replied, "I understood it as such from all that passed between the parties in my presence."

On cross-examination, Davis says, he does not recollect whether he was called upon by Mrs. Farrell to witness the receipt, or whether she said any thing about it; Mr. Bean requested him to sign it. Being asked whether he read it before it was read to Mrs. Farrell? the witness answers, "I could not read it; I was not able to read it myself." He went over to Mrs. Farrell's at the request of Mr. Bean, and knew nothing of the transaction before going over. His knowledge of

the purchase was derived from what passed between the parties on that occasion. To the best of his recollection, the receipt was written at Mrs. Farrell's whilst he was there.

Upon further examination by the defendant, being asked who was present at the time of the execution of the receipt? Davis says: "Mr. Smith Turner, Mrs. Farrell, Mr. Bean and myself."

The complainant asks for relief, upon the ground that the contract was designed and actually understood to be a mortgage, and not an absolute sale; the defendant however insists, that the contract was just the reverse. He relies upon the receipt and the testimony of Davis as proof of an actual sale; whilst the complainant contends, that if the receipt is to be so regarded it is fraudulent.

The testimony of the complainant's three witnesses, (the two Turners and Moore,) must be sufficient to sustain her title to relief, unless that testimony is untrue, or is inadmissible in opposition to the receipt; and we do not think it should be rejected or disregarded upon either of those grounds.

It cannot now be doubted, that a contract though in writing, may be impeached for fraud, by parol evidence. Nor can it be denied, when fraud is charged and there is proof of circumstances occurring at the time of the contract, or subsequently, tending, to sustain the charge, that negotiations or transactions prior to the contract, having a similar tendency may be given in evidence. Were it not so, the most convincing proof of fraud would frequently be excluded. In *Davis vs. Calvert, et al.,* 5 *G. & J.,* 303, *C. J. Buchanan* says: "Fraud vitiates every thing with which it is connected. A will or testament, therefore, which is obtained by fraud is void, and though fraud is never presumed, yet it is not necessary to prove it by positive and direct testimony. But being usually wrapt up in mystery, if well concerted, it is generally by circumstances only, by inductions of particulars, some of them often apparently trivial, that it can be brought to light and defeated. And in a question of fraud, any fact, no matter how slight, bearing at all on the point at issue, and not wholly irrelevant, may be admitted." In *Wesley vs. Thomas,* 6 *H.*

*&. J.*, 27, it is said: "It is most true, that the court of chan-
cery, in the exercise of its moral jurisdiction, as it has been em-
phatically termed, will upon the proof of fraud, mistake or sur-
prise, raise an equity, by which the agreement of the parties
shall be rectified." Shortly after this remark, reference is
made to a decision of *Lord Nottingham*, in which, upon parol
proof of fraud, he rectified an absolute deed by considering it
as a mortgage. And the court likewise refer to the case of
*Irnham vs. Child*, 1 *Brown's Ch. Rep.*, 92, as showing that
"if a clause of redemption be omitted through fraud, to be
inserted in a deed granting an annuity, a court of equity will
reform the agreement by parol evidence *aliunde*." See also
*Watkins vs. Stockett* 6 *H. &. J.*, 444. *Henderson vs. May-
hew*, 2 *Gill*, 409.

In *Jones vs. Hardesty*, 10 *G. &. J.*, 416, the principle is
recognized, that a written contract excludes parol evidence of
the prior verbal agreement. But the court are careful to
qualify the principle, by confining its application to cases in
which there is an absence "of all proof of fraud, surprise or
mistake."

In *Dougherty vs. McColgan*, 6 *G. &. J.*, 275, there was
a loan of money and a mortgage given, as collateral security
for the re-payment of it. Afterwards, an absolute deed for the
same property was given by the borrower to the lender, who
executed a bond for the conveyance of the property at the
end of twelve months, upon the payment of the same sum of
money for which the original mortgage was given. It was
the inability of the mortgagor to pay the claim, and a wish on
his part to have the time of payment extended, which induced
him to enter into the arrangement in regard to the absolute
deed and bond of conveyance. The bill filed prayed for a re-
conveyance of the property, upon the payment by the com-
plainant, (the original mortgagor,) of whatever sum might be
found due from him. The court held the claim upon the
property, on the part of the original mortgagee, still continued
to be a mortgage, notwithstanding the absolute deed and bond
of conveyance. And at page 281, it is said: "A covenant to
pay the debt, or to repay the money lent, is not (though

proper to be introduced) an indispensable ingredient to a mort-gage. If a security for the money is intended, that security is a mortgage, though not bearing upon its face the form of a mortgage, which chancery does not respect, but looking through the whole transaction as far as it can, (with the defeasance if there be one,) to ascertain the true character of the contract; if it be found to be different in reality from the appearance it assumes, will remove the veil with which it is covered. And where the relation of mortgagor and mortgagee is once fairly established, though the equity of redemption may be sold or disposed of to the mortgagee; yet unless the transaction appears to be fair, and unmixed with any advantage taken by the mortgagee, of the necessitous circumstances of the mortgagor, equity will hold the parties to their original relation of debtor and creditor."

In the consideration of this case the following very import-ant facts, which are undoubtedly true, should be kept con-stantly in view. The contract was made between an illiterate woman, not able either to read or write, and a man of busi-ness—a merchant—who wrote the receipt. The agreement was concluded, the receipt written and executed, at one inter-view, and all in a short time. The appellant had no legal advice on the subject, and indeed no friend to consult except her brother, Smith Turner, whose interest in the contemplated arrangement, was such as to prompt him not to throw any im-pediment in the way of its consummation; for he was to be benefitted by having the judgments transferred to his sister, which he owed to Bean.

That the paper marked X, is not a formal deed or bill of sale, but upon its face purports to be a *receipt*, is not unworthy of some consideration.

If the testimony of Smith Turner is to be believed, it shows beyond doubt, that the contract was a mortgage and not an absolute sale; and that the appellant so understood it, when she executed the receipt. She had good reason for doing so; having been told by the appellee that he had not the mortgage, and having no form he could not draw one properly, as it was a long instrument, but a receipt would do as well.

The character of the contract as disclosed by this witness is corroborated by the testimony of Moore. In 1846 he called on Bean, with a view of trying to get possession of the negro, and offered "to pay off the mortgage" for that purpose. This offer was declined, but why? It was not because Bean did not hold the boy under a *mortgage*, but because he could not give the witness possession without the consent of Mrs. Farrell. All he wanted was his money, still he could not do as the witness wished, without her consent. If the transfer was an absolute sale what interest had the appellant in the boy, which could render her consent necessary in regard to any disposition of him? If however she is regarded as a mortgagor, the refusal to accept the offered payment of the *mortgage* without her consent may be easily understood.

The interviews between the appellee and Wm. A. Turner, as detailed by him, are entirely inconsistent with any other theory than that of a mortgage. We therefore have three witnesses sustaining each other, whose united testimony affords strong proof of a mortgage instead of a sale. The appellee however contends, that this proof is much weakened by the contradictory evidence given by his witness Davis; whilst the appellant says he is not to be believed.

His name appears upon the receipt as a witness, but we feel bound to say the proof renders it at least doubtful, whether he could write at that time.

L. S. Roby testifies that he was frequently told by Davis, he could neither read nor write; and had often been asked by him to sign his name, for him to make his mark. Between 1846 and 1849, he called on the witness to make calculations for him and to sign his name. He was engaged as a laborer upon the streets in Washington, and sometimes in cleaning out the canal. It was to make calculations for his wages, and to sign his name to receipts for them, that he called on the witness. T. H. Padgett, being asked, "Do you know whether Mr. John T. Davis could read or write? if yea, state whether he could or could not, and how you derive your information?" His answer is: "He told me he could not once or twice; upon one occasion I had sold him a saddle; I wanted him to give

me his due bill for it. He told me he could not write. I then offered to write the due bill and he told me he did not know how to sign his name. This was when he was living with Mr. Bean."

Davis also informed the witnesses Swann and Harbin, that he could not read.

Freeman and Hunt, witnesses for the appellee, testify that Davis could write. The latter of the two says: "I have seen him trying to write his name when I lived with Mr. Bean. At the same time Davis lived there, and at night also when he had finished his work, I have seen him trying and seemed to be very anxious to learn. I have seen him write his name so it could be understood. He wrote a very bad hand. I could just make out that it was John T. Davis. This was either in 1843 or 1844, or in one of those two years. I have seen him at the same time try to read and spell."

We have seen that in this case, Davis has said he was not able to read the receipt, at the time of its execution.

A few days previous to his examination he was seen by Roby, who asked him if he was not to be a witness, and whether he did not come down for that purpose? to which inquiry Davis answered in the negative. During the conversation he offered to bet he was not to be a witness, and said at the same time, "*I know nothing about the case.*"

In addition to this declaration by the witness himself, and the proof rendering it at least doubtful whether he could write, it appears from the testimony of Smith Turner, that he was not present when the contract was made and the receipt was executed, on which his name appears as a witness.

Under these circumstances we cannot regard the evidence of Davis, as sufficient to overrule or invalidate the testimony of Smith Turner, as to the real character of the contract, supported and sustained as he is by two other witnesses.

With a view to discredit Smith Turner, or to impair the effect of his testimony, the appellee insists, that the proof in the cause shows him to have been in error, on his first examination in chief in the following particulars: He said there was one judgment assigned, when in fact there were two; that the amount

of the judgment was $101, whereas, at the time of the contract the two judgments assigned amounted to $125 and some cents.   He also said the cash advanced by Bean was $50, and on a subsequent examination, Turner himself, said he received for his sister in cash, the further sum of $16.   But it is apparent the witness did not design to deceive, by speaking of one judgment instead of two; for in giving the amount it did not correspond with either one of them, but was equivolent to the aggregate principal of the two, within sixteen cents.   And in saying the amount was $101, he evidently had reference to the principal alone, without including interest and costs.   He was speaking from recollection, and a man may very well remember the principal of his indebtedness upon judgment, without being able to say what is the whole amount, including interest and costs, when he has no statement of the claim before him.

In regard to the $16, the witness was asked whether he did not get that sum from Mr. Bean, a few days after the assignment, to go as the other $50?   His reply to which, as we have seen, is: "I now recollect, being reminded of it, I did, it was to be a further lien for that amount upon the negro boy; I should have mentioned it in my first examination had I recollected it at the time."   Instead of this being any evidence of an intention to deceive or to conceal the truth, it shows a readiness to disclose his knowledge of the fact, so soon as his memory was refreshed by the inquiry.   Upon his examination in chief, he had said the judgment and the $50 in cash, constituted the amount for which the negro was transferred.   And on cross-examination he also said, the $50 was all the money paid at the time of the transfer, and *all that he knew of.*   That the money was a single $50 note.   This was said on the same day his answer was given to the inquiry, relative to the $16.

Having thus testified, if the witness had been detailing a false story, concocted for the occasion, it is not reasonable to suppose he would have acknowledged the receipt of the $16; especially as the record exhibits no other proof of that sum having been paid.   Davis says nothing about it.

The defendant in his answer says, that no note or memo-

randum was made, of the agreement on his part to let the complainant have the boy back again, and therefore, he pleads the statute of frauds to so much of the complainant's bill as seeks relief, for and on account of, such parol agreement. This plea of the statute seems to be based upon the hypothesis, that the complainant is claiming relief, on the theory of an absolute sale by her to the defendant, and a resale from him to her. But it is not so. She insists that the original contract was a mortgage, under which the negro was delivered at the time, to the defendant, and she is claiming the right as mortgagor to redeem. The statute of frauds is no bar to such a claim.

Because there is no proof of any particular time when the money was to be paid, the defendant says, that for want of mutuality in the contract insisted upon by the complainant, it cannot be enforced by her. But this is not true; for when no particular time of payment is limited in a mortgage, it is to be paid in a reasonable time. And if the payment is not so made the mortgagee is entitled to a foreclosure.

Having considered the case with considerable care, we are brought to the conclusion, that the appellant is entitled to relief, upon the ground that the contract was a mortgage or pledge of the negro, with a right on her part to redeem him. She ought therefore to be allowed to redeem, upon paying to the defendant, or bringing into court to be paid over to him, the sum of $191.70, after deducting therefrom the appellant's costs in both courts. This sum of $191.70, is composed of the following amounts, to wit: $125.70, the amount of the judgments, $50 cash advanced on the day of the contract, and $16 cash advanced a few days after. There is no proof showing any further sum has been lent or paid by the appellee on account of the negro.

The bill calls for no account of profits or hire, and consequently no such account will be directed; but as the testimony shows, that the appellee has had possession of the negro from the time of the contract, and that his services or hire are considerably more than the interest on the amount lent to the appellant, no interest will be allowed in favor of the appellee.

The decree below, being inconsistent with the views here

expressed, will be reversed, and the cause remanded, so that the circuit court may pass a decree, and cause the same to be carried into effect, according to the principles of this opinion.

*Decree reversed and cause remanded.*