## SARAH W. LAWSON *vs.* WILLIAM A. MULLINIX.

*Specific Performance— Contract to Convey Land Enforced Against Prior Grantee in Voluntary Deed—Varying Stated Consideration in Deed — Waiver of Right Under Contract ·by Acceptance of Voluntary Deed—Inadequacy of Consideration—Contract Fixing no Time for Conveyance—Mutuality—Implied Obligation to Pay—Laches.*

In· 1900, one D made an agreement in writing to sell his farm to the plaintiff. D remained in possession until his death in July, 1903. Two months before that time, D requested plaintiff to surrender his claim to the farm and accept the return of the sum of ten dollars which had been paid on account, so that he could give the farm to his daughter,

the defendant. The plaintiff refused to surrender his claim, and the defendant then knew that he had some kind of interest in the property, but at that time she set up no claim to it for herself. A few days afterwards D conveyed the farm to the defendant by a deed which recited the consideration to be five dollars, and love and affection. In answer to a bill for the specific performance of the contract of sale against the defendant and the heirs at law of D, the defendant alleged that in 1897, her father D wrote to her promising that if she would come and live with him and keep house for him until his death, he would convey the farm to her, and that she had consequently taken up her abode with him from that time until his death. The evidence in support of this allegation was that D had caused letters, since destroyed, to be written to the defendant in which he promised to leave the farm to her, if she would live with him. In this suit, the defendant claimed the property under the voluntary deed of 1903. *Held*, that the defendant's deed cannot be supported by evidence of any other consideration than that stated; that such voluntary deed does not avail against plaintiff's rights under the contract of sale, and that the defendant's evidence fails to establish such an equity in the property as deprives the plaintiff of his right to relief as a *bona fide* purchaser without notice.

There is no ground for refusing the specific performance of a contract to sell land, on account of gross inadequacy of consideration and unfairness, when the contract price is $3,800, and the evidence is that the property was worth from $4,500 to $5,000, especially when the price was fixed by the vendor.

The fact that a contract for the sale of land fixes no time for the conveyance and payment does not make it too indefinite to be specifically enforced, since the law implies that payment is to be made within a reasonable time.

A contract signed by both vendor and purchaser in which the vendor agrees to convey land in consideration of a certain sum, may be specifically enforced by the vendee, although the contract does not contain an express promise by him to pay the purchase-money. In such case, the obligation on the part of the purchaser to pay is implied, and the contract is not lacking in mutuality.

The purchaser of land under a contract of sale is not guilty of laches when he was ready to pay the purchase-money and demand a conveyance, but refrains from doing so at the request of the vendor, who was old and ill, and resided on the property, and when he files the bill for specific performance six months after the vendor's death.

*Decided November 1st, 1906.*

Appeal from the Circuit Court for Montgomery County (JAMES B. HENDERSON, J.) The contract referred to in this case

was ss follows: "This agreement made this 22nd day of Sept.,
1900, between Mareen Duvall of the first part and William A.
Mullinix of the second part, Witnesseth, that in consideration
of the sum of three thousand eight hundred and twenty-five
dollars the said Mareen Duvall agrees to sell his farm situated
three miles East of Damascus, and known as "Duvall's
Range." Containing one hundred and fifty seven acres,
more or less, to the said William A. Mullinix."

The cause was argued at the April Term, 1906, before
McSHERRY, C. J., BOYD, SCHMUCKER and BURKE, JJ., and was
re-argued at the October Term, 1906, before McSHERRY, C.
J., BRISCOE, BOYD, SCHMUCKER, JONES and BURKE, JJ.

*D. W. Baker* and *Frank J. Hogan* (with whom was *Bowie
F. Waters* on the brief), for the appellant.

*H. W. Talbott* and *Chas. W. Prettyman*, for the appellee.

BOYD, J., delivered the opinion of the Court.

The appellee filed a bill for specific performance against the
appellant and other heirs of Mareen Duvall. The bill was
dismissed as to all the defendants except the appellant, and a
decree was passed requiring her to convey to the appellee the
property mentioned in the proceedings, upon the payment by
him of the sum of $3,815, less his costs. On the 22nd day
of September, 1900, Mareen Duvall entered into an agree-
ment with the appellee to sell him his farm known as "Du-
vall's Range," for the sum of $3,825, and the appellee paid
him ten dollars thereon. No further payments were made
prior to the death of Mr. Duvall, which occurred on July 2nd,
1903. On June 1st, 1903, Mr. Duvall conveyed the farm to the
appellant, his daughter—the consideration named in the deed
being "the sum of five dollars and the love and affection I
have for my daughter." The appellant for her defenses re-
lied on the five following grounds:

1st. That she possessed an equitable right to the property su-
perior to that of the appellee. 2nd. That she possessed an equity

equal to that of the appellee and in addition thereto had the legal title.    3rd. That the appellee's contract with Mareen Duvall was not such as entitled him to specific performance. 4th. That this contract upon which the appellee relies is unilateral, and 5th. That the appellee was guilty of laches.

The theory of the appellant is that if it be conceded that the agreement between the appellee and Mr. Duvall was a valid contract, she had a prior equity in the property by reason of a promise made by her father to give her the farm if she would live with him and keep house for him during his life.    The testimony shows that she did so and she relies on the maxim that "between equities, priority of time will prevail."    We will consider together the first two defenses relied on, as stated above.

*First.* The appellant was living in Frederick County in February, 1897, when she moved to her father's place in Montgomery County, in consideration, as she claims, that he would give her the farm.    She lived with her father and kept house for him from that time until his death.    It will be well to at once ascertain the circumstances under which she went there, as disclosed by the record.    She testified that she received two letters from her father, both of which she destroyed, and gave as a reason for not having them that she never kept letters.    In the first, her father wrote that he thought of selling the place, but if she would come there that he would not sell it, and she said of the second letter, "then he wrote me word that still if I would come and live with him that he would not sell the place and that I could have it."    She also said that he went twice to see her and "he furthermore stated after I got there that I should have the place."    Mrs. Darby, a sister of the appellant, testified that she had a conversation with her father and "He requested me to write a letter to her for him telling her to come down to keep house for him, that if she didn't, he would have to sell the place.    If she would come and keep house, he would leave her the place for a home for her."    She said her daughter wrote the letter at her dictation and she again spoke of a conversation with her father in which

"he said he wanted her to come and keep house for him and that he would leave her the place when he was gone." The daughter testified that she wrote the letters and said of the second that "grandpa told me to write to Aunt Sally, if she would come down and live with him he wouldn't sell the place and that she could have it at his death." That is all the testimony on the subject, excepting some statements made by Mr. Duvall after the agreement with the appellee was made, which we will refer to later.

There would seem to be no doubt that the appellant would, under that evidence, have had no standing in a Court of equity to compel her father to convey the property to her in his lifetime. While in her own testimony she did not in so many words say that her right to the property was to begin from the time of his death, that could be inferred as she was not, according to her own statement, entitled to it during his life. But Mrs. Darby and her daughter removed any possible doubt on that subject, as will be seen by what we have quoted above. As Mr. Duvall had his whole life in which to perform, there could be no breach until after his death. 26 *Am. & Eng. Ency. of Law*, 93; *Manning* v. *Pippen*, 86 Ala. 357; *Flowers* v. *Cruikshank*, 77 Iowa, 110. If it be conceded that Mrs. Lawson would have been entitled to a decree for specific performance against the other heirs of her father, if she had not received the deed, is she in a position to deny the right of the appellee to such relief? Is her equity superior or equal to that of the appellee? There is nothing in the record to show that the appellee either had notice of the appellant's claim, when he entered into the agreement with Mr. Duvall, or that the appellant had such possession of the property as would put him on inquiry or cause him to suspect that she had any interest in the property. On the contrary, the evidence shows that after Mrs. Lawson went to live with her father, he continued his control over the property, rented parts of it to tenants, collected his share of the rents, and did nothing that would suggest to the appellee that Mrs. Lawson or any one other than himself had any interest in the property or that had he made any promise to leave it to Mrs. Lawson after his death.

In the latter part of May, 1903, Mr. Duvall sent for the appellee and clearly and fully recognized his agreement to sell the property to him.   The object in sending for the appellee was to get him to surrender his claim to the farm so he could give it to Mrs. Lawson.   There can be no doubt about that from the evidence in the record.   Mrs. Lawson testified that upon that occasion "father told Mr. Mullinix that the place was for me.   That I wanted it for a home.   Mr. Mullinix didn't make him any answer to that, and he repeated it and Mr. Mullinix said that he bought the place.   Father told him that he wanted me to have it.   *   *   *  I offered him back his ten dollars.   He wouldn't say that he would accept of it." Miss Darby, a granddaughter of Mr. Duvall, testified that he sent for Mr. Mullinix, that "grandpa told him Aunt Sally was to have the place, and asked him what he had to say * * * He didn't say anything  *    *    *   .   My grandfather said, Mr. Mullinix, I sent for you to give you the ten dollars. Sally is to have the place."   On cross-examination she said "Grandpa said Mr. Mullinix had given him ten dollars as part of the agreement for buying the place.   He was to give him twenty-five dollars, and only gave him ten."   So without quoting from the testimony offered by the appellee, which thoroughly sustains the fact that Mr. Duvall did on that occasion recognize his agreement and wanted the appellee to accept the ten dollars and give him up his claim to the property, the evidence of the appellant shows that such was the case and that she at least at that time knew that Mr. Mullinix had some kind of an interest in the property.   But notwithstanding that, a few days afterwards (June 1st) she accepted the deed from her father, which recited the consideration to be "the sum of five dollars and the love and affection I have for my daughter"—not a word in it suggesting that there was such consideration as she now relies on.   Although the learned solicitors for the appellant concede that she cannot sustain her defense under that deed alone—the consideration being of a different kind—we find in the record in her examination in chief this testimony:   "Q. You are still in posses-

sion of the place, I believe? A. Yes sir. Q. And claim it under the deed that has been offered in evidence? A. Yes sir.''

The testimony we have thus far referred to (most of which was offered by the appellant) is such as should cause a Court of equity to hesitate to grant the appellant any relief based on it, even if the appellee had not acquired any right to the property. In the first place, what the contract was between her and her father, if we concede there was one, is left in great doubt. In her answer she alleged that it was that the property was to be *conveyed* to her while the evidence of the witnesses produced by her to prove the contents of the two letters which she claims to have received from her father, was that he said ''he would leave her the place for a home,'' that ''he would leave her the place when he was gone,'' and that ''she could have it at his death.'' They were speaking of the alleged contents of letters written seven or eight years before their testimony was given and the appellant herself attached so little importance to them that she did not preserve them. It is manifest that those witnesses were to a great extent placing their own interpretation on the meaning of the letters. While it may be conceded that the appellant could not be expected to be well versed in business principles, no one can read this record without reaching the conclusion that she was duly watchful of her own interests.

But there can be no doubt that Mr. Duvall did not understand that he was under any legal obligations either to convey or to devise this farm to the appellant, for about three years after she moved to his place, he made the contract to sell it to the appellee. There is no suggestion in the record that he was of the character of man who would thus perpetrate a fraud on his daughter, and it may be added here that the position assumed by her in effect charges her father with fraud. If she is right, then his attempted sale to the appellee was a fraud, either on him or her, as he could not have honestly entered into this contract, if he had made an agreement with the appellant either to convey or devise the property to her, un-

less she consented to it.   But the evidence shows that he
continued to exercise control over the place and did every-
thing that an owner of his age could do with his property.
The appellant admits that she had heard "from outsiders"
that there was a contract in existence with the appellee, but
there is no evidence that she ever complained of it to her
father or told the appellee that she claimed any interest in the
farm.   The old gentleman told other people of his sale to
Mr. Mullinix and, to say the least, it is peculiar that he did
not tell his daughter who was living with him, and still more
so that she did not speak to him about it when she heard of
the contract with Mr. Mullinix.

But there is a most significant fact in the record bearing on
this subject.   When Mr. Duvall sent for Mr. Mullinix a few
weeks before his death to ask him to give up his claim to the
farm, so he could give it to Mrs. Lawson, she did not suggest
that she had any legal right to it—nor did the old gentleman.
Is it possible to believe that she would not have asserted her
right then and there or that the old man, who was then on
his death bed, would not have spoken of the agreement with
her if they had made one? Is it not much more reasonable to as-
sume that although he was under no legal obligations to con-
vey the property to her, he had concluded to leave it to her—
either by reason of her persuasion, or possibly because he felt
that she should have it, as she had lived with him for six
years.   Although she was already well provided for, it is
not altogether unnatural that he then felt like rewarding her
for any services she had rendered him—especially if, as one
of the witnesses testified, "he said he thought she would do
right."   Another circumstance might be referred to in this
connection.   Mrs. Boyer, who was one of three heirs of Mr.
Duvall—being the daughter of a deceased sister of the appel-
lant—in her answer filed to this bill charged the appellant and
Mr. and Mrs. Darby, with "conspiring and contriving together
to cheat and defraud the defendant, Annie Boyer, out of every
interest she might have in the estate of the said Mareen Duvall,"
and alleged that the deed involved in this case was procured

"by the undue influence and artifice practiced and exercised by them upon the said Mareen Duvall." But notwithstanding that serious charge in the record, the appellant brought out the interest of Mrs. Boyer in the farm and in all the estate of Mr. Duvall for which a deed was executed, reciting as the consideration the sum of ten dollars. That deed was not executed until about the time the testimony was taken. If the appellant believed that she was entitled to the farm under an agreement made with her father six years before his death, it does seem strange that she would have purchased this third interest—whether it was for the nominal consideration named in the deed or more—when such a charge remained unexplained on record against her. So without dwelling upon the fact that when Mrs. Lawson went to live with her father she was not making any great sacrifice (as she was then occupying a similar position at her brother-in-law's house without receiving any compensation other than her board) but was only doing what any daughter, situated as she was, should gladly do for an aged father, it seems to us that the appellant has failed to establish such an equity in this property as should deprive the appellee of relief.

But beyond all this, the appellant after failing to induce Mr. Mullinix to surrender his interest in the property, accepted the deed from her father and in her testimony said she claimed the property under that deed. How can it now be claimed for her that the real consideration was the alleged agreement made six years before her father's death? Of course after the receipt of that deed she could not have had specific performance of her alleged contract, either against her father in his lifetime, or against the heirs after his death, as the deed itself would have been a complete answer to such a proceeding. But when she accepted the deed, which recites a consideration so clearly repugnant to that now attempted to be set up, is a Court of equity to say that although she is contradicted by the deed, it will permit her to go behind it and set up another and altogether different consideration in order that the contract made by her father with the appellee may be defeated? Not to

speak of the objection to that under well established legal principles, would it be just to the memory of Mareen Duvall? We have already seen the position that the appellant's claim places her father in, and as he is now in his grave, is she to be permitted to deny that what her father said in the deed accepted by her was true—that he conveyed the farm to her in consideration of the sum of five dollars and love and affection— not because he was under any legal obligation to do so by reason of an agreement made with her six years before? If that be permissible, then indeed are the opportunities for fraud great. A man on his deathbed is likely to state the truth, whether it be spoken or written, and when we find this old man requesting the appellee to surrender his right to this property and after his refusal stating in the deed why he made it, but on neither occasion intimating that he was under any legal obligations to convey the property to his daughter, we should believe him in preference to statements which reflect upon his good name.

But can the appellant contradict this deed by setting up the consideration now relied on? The bill prayed that it be annulled and set aside and also that the agreement of the appellee be specifically enforced. Although the other heirs were made parties,the answer of Mr.and Mrs.Darby alleging that the deed was valid and that they had "no present interests in said property" and the deed from Mr. and Mrs. Boyer, leaves the property in the appellant, subject to this claim of the appellee. He would therefore have the right, if his agreement is sustained, to have the deed to the appellant set aside and to have the property conveyed to him.

We do not understand it to be denied that as this deed is a voluntary one, it cannot of itself be successfully set up as a bar to the relief sought in this case. But how is that difficulty attempted to be overcome? It is by setting up a different consideration as the one that influenced Mr. Duvall to give the property to the appellant, and then in effect contending that although it is true she cannot rely on the deed to defeat the appellee's contract, yet six years before it was made,

her father agreed for another and entirely different considera-
tion from that named therein to convey the property to her.
Can she be permitted to set up such a defense after accepting
the deed?    Is it not in effect, however you term it, an attempt
to vary the consideration in the deed?    If her contention un-
der the circumstances is sustained, then it will be easy for
debtors and others, relying on such deeds, to perpetrate the
grossest frauds.    For whenever a voluntary deed is attacked,
all that the grantee need do against general creditors and
those situated as the appellee is (having no record title or
lien) to set up some such agreement as the appellant relies on
and contend that although it is true that the deed which has
been attacked is invalid because voluntary, yet that that was not
the real consideration moving the grantor, and the defendant
has an equity at least equal if not superior to the plaintiff and
the bill must fail.    Surely a Court of equity should not tolerate
such a defense.    If it will, what is the value of such cases as
that of *Sewell* v. *Baxter*, 2 Md. Chancery, 447, where the
consideration in the deed was five dollars and natural love
and affection, and the defendant undertook to set up as a de-
fense that the land had been purchased by her father for her
and with her money and that her father at the time and fre-
quently afterwards promised that a deed should be made to
her for the land?    The Chancellor set aside the deed on the
ground that it was voluntary, and said that "The decisions in
this State are conclusive to show that parol proof is inadmis-
sible to vary the consideration stated in deeds, and thereby
either to alter their character, or to maintain them when im-
peached for fraud by showing considerations differing from
those mentioned in them."    That case has been followed by
this Court and the same principle announced a number of
times.    If the appellant's position is tenable, why could not
Mrs. Baxter have defeated the creditors of her father by show-
ing what the real consideration was, and that her father had
agreed to convey the property to her for that consideration?
Call the appellant's defense what you may, it is in effect an
attempt to vary the consideration of this deed.    Her answer

in terms relies on this deed, and alleges that the property was *conveyed* to her by virtue of an agreement between her and her father, made six years before. That such a deed is not valid against one occupying the position the appellee does, has been decided over and over again, and to permit her now, notwithstanding her answer, her evidence, and the terms of the deed itself, to rely on the defense set up for her, would not only be a most dangerous precedent, but is not sustained by any case that has been cited, or by any that we have been able to find.

The opinion of the lower Court was clearly right on that question, and we would add that any prior agreement between the appellant and her father in reference to the transfer of this property was merged in the deed. We do not deem it necessary to discuss that question, but the general doctrine as announced by this Court can be found in *Worthington* v. *Bullitt*, 6 Md. 195; *Bladen* v. *Wells*, 30 Md. 581; *West Boundary Company* v. *Bayless*, 80 Md. 495, and other decisions in this State. On either of the grounds mentioned, this deed prevents the appellant from setting up the defense relied on.

*Second.* The agreement of September 22nd, 1900, *was signed by Mr. Duvall and the appellee*, and it recites "that in consideration of the sum of three thousand eight hundred and twenty-five dollars the said Mareen Duvall agrees to sell his farm, situated three miles east of Damascus, and known as 'Duvall s Range,' containing one hundred and fifty-seven acres, more or less, to the said William A. Mullinix." On the same day Mr. Duvall gave a receipt which reads. "Received of William A. Mullinix the sum of $10.00 dollars, in part payment for my farm situated," etc.,—being described as above. It is contended on behalf of the appellant that the farm is worth more than the above sum, and it would be inequitable to decree a specific performance of this contract. There is testimony tending to show that in the opinion of witnesses it was worth $4,500 or $5,000, or possibly more, but according to the evidence of the appellee Mr. Duvall himself fixed the price named in the agreement. That is not contradicted, unless it be by statements that Mr. Duvall had said that he had

asked Mr. Mullinix five thousand dollars for it, but even that was three of four years before the agreement was made, as it was when the letters were written to Mrs. Lawson, in 1896 or 1897. But although Mr. Duvall lived nearly two years after the date of the contract, there is nothing whatever to show that he ever suggested that the price was too low. He talked with the appellee several times about the place, and even when he sent for him the month before he died, and requested him to release his claim to the property, he did not complain of the price. One of the witnesses for the appellant testified as to the condition of the property, that in 1900 it was "only ordinary condition"—that the fields had been rented to various tenants for some years. Again he was asked, "Q. In what sort of repair were the buildings and fences at that time? A. In ordinary condition, so far as the fencing was concerned some was up and some was down. Q. Were the buildings in pretty fair condition? A. The dwelling house was. Outside of the dwelling house the buildings were in ordinary condition." In *Young* v. *Frort*, 5 Gill, 287, our predecessors said, "A Court of equity does not affect to weigh the actual value, nor to insist upon the equivalent in contracts, where each party has equal competency. When undue advantage is taken, it will not enforce that. Improvidence or inadequacy do not determine a Court of equity against decreeing specific performance." The same thing was said in *Shepherd* v. *Bevin*, 9 Gill, 32, and the Court after referring to cases cited, said: "None of them assert that inadequacy of price alone, unattended by fraud or circumstances of suspicion, was ever declared sufficient ground to avoid a contract in other respects regular. On the contrary, the parties have a right to make their own contracts, and the mere inadequacy of price is no ground of objection, where the contract is fair and voluntary." In speaking of opinion of witnesses on values of properties, the Court in *Johnson* v. *Johnson*, 7 Gill, 291, said, "Nothing can be more precarious and uncertain as a standard of value, than that erected by those diversified and speculative opinions. Each opinion is constituted of different elements, depending

upon the taste, habits, pursuits and feelings of the witness."
There is nothing in the record to suggest that Mr. Duvall was
imposed on by the appellee.   It is true he was an old man,
but he attended to business for several years after the con-
tract was signed, and never intimated that he had been im-
posed on.   Even in his last sickness he seemed to be thor-
oughly familiar with and to understand the agreement he had
made, and as the appellant accepted a deed of him nearly
three years after that time, she could not consistently say he
was not competent to make the agreement.

The contract is sufficiently definite as to the property sold,
and the only thing in it which was not definitely fixed was the
time in which it was to be consummated.   But there can be
no doubt that, in the absence of some time being named in
the contract, a Court of equity would require it to be consum-
mated in a reasonable time.   In *Triebert* v. *Burgess*, 11 Md.
452, there was a contract to give a mortgage but no time for
payment was named.   Our predecessors said : "Another ob-
jection to this contract is, that it cannot be specifically en-
forced, because it is too indefinite, inasmuch as no time is lim-
ited for payment of the mortgage, and as the parties have
agreed upon none the Court cannot undertake to fix it.   Such
an objection is not a valid one.   Very recently, in *Farrell* v.
*Bean*, 10 Md. Rep. 223, this Court has said: 'When no par-
ticular time of payment is limited in a mortgage, it is to be
paid in a reasonable time.   And if the payment is not so
made, the mortgagee is entitled to a foreclosure.'"   In *Wil-
liamson* v. *Neeves*, 94 Wis. 656, it was held that the fact that
no time was fixed for the conveyance of land was immaterial,
because the legal implicaiion would be that the conveyance
was to be made within a reasonable time.   Such time as was
really necessary for the preparation of the deed, examination
of the title, etc., would be allowed, and a Court of equity
would see that such reasonable time was allowed.   See also
26 *Am. & Eng. Ency. of Law*, 77; *Johnson* v. *Johnson*, 40 Md.
189.

*Third.* Again, it is said that the contract is unilateral.   We

have already seen that both parties signed it and the appellee paid part of the purchase-money. There would seem to be no room to question that under our authorities the appellee was under obligation to pay the balance of the purchase-money. In *Engler v. Garrett,* 100 Md. 387, this Court held that a decree for a specific performance should have been passed by the Court below, and in that case the memorandum in writing was only signed by the vendor who acknowledged receipt of $25, as a part of the consideration ($1,250) for the house mentioned. JUDGE FOWLER there quoted from *Waterman on Specific Performance,* sec. 201, that "There may be a mutual contract to which both parties have given their assent, though the evidence of such assent may exist in a different form as to the two parties. As to one, it may be verbal, while the other's is expressed by his signature in writing," and he continued: "The testimony as to the plaintiff's acceptance of the contract is ample and besides this, if there had been doubt on this question, it disappeared when he filed his bill to enforce it." See also *Maryland Clay Co.* v. *Simpers,* 96 Md. 1; *Black* v. *Woodrow,* 39 Md. 215; *Balto. Brew. Co.* v. *Callahan,* 82 Md. 106; *Travelers Ins. Co.* v. *Parker,* 92 Md. 22; where it is shown that there is an implied obligation on the purchaser to pay, although there may be no express promise in the agreement. In this case the testimony shows that the appellee was at all times ready to pay the balance of the purchase-money, but the consummation of the sale was postponed at the instance of Mr. Duvall.

*Fourth.* The appellant also contends that the appellee is not entitled to specific performance by reason of his laches, but as we have just seen, the delay was at the instance of Mr. Duvall. The testimony shows that he was then applying for a patent on his farm, which was subsequently granted by the Commissioner of the Land Office. Mr. Duvall sent word to the appellee that he expected to have his patent by the first of August, and also that he had better sow some clover seed in a lot he pointed out. The appellee saw him several times and in August, 1902, told him he heard he had his patent

and had come to see him about the farm. Mr. Duvall replied that his health had become such that he did not see how he could give up the farm while he was living. The appellee told him he knew he was a very old man and did not want to inconvenience him. Several witnesses were present at that interview. The patent was not issued until the 25th of February, 1902, and when the appellee was informed that it had been issued, he called upon Mr. Duvall. Surely he could not complain of laches when the delay was at his request. The appellee's delay under the circumstances is to be commended and it was a very kind and proper act not to require the old man to leave his home. He died in July, 1903, and this bill was filed February 25th, 1904. The appellee testified that he had been ready every since the agreement was made to pay the balance of the purchase—money. He had part of it in hand and had made arrangements with a bank for the balance. There is no evidence of any laches on his part, excepting the mere lapse of time which is fully explained. The fact that he did not file the bill until seven or eight months after Mr. Duvall's death would not be sufficient to defeat his right to relief and the appellant could not have been injured by that delay. She knew of this contract and notwithstanding it, got the deed from her father, but the appellee gave her no reason to believe he would surrender his right to the property.

It may be well to add that no question was raised in the case about the right of either the appellant or the appellee to testify. Chapter 495 of the Acts of 1902 was in force when the bill was filed, and ch. 661, of the Acts of 1904, provided that "this Act shall not apply to pending cases, nor in any wise affect the present rights of litigants therein." So without regard to the question whether the appellant and appellee would be competent witnesses under the present law (Act of 1904), it does not apply to their testimony in this case and they were not incompetent under the Act of 1902. The decree will be affirmed.

*Decree affirmed, appellant to pay the costs.*

McSHERRY, C. J., dissented.