READ DRUG AND CHEMICAL CO.
VS.
JENNIE NATTANS.

*Randolph Barton, Jr., J. Pembroke Thom* and *Joseph C. France* for plaintiff.

*Charles F. Harley* and *Lee S. Meyer* for defendant.

DAWKINS, J.—

Before discussing the case it is proper to dispose of the motions presented by the defendant to strike out certain testimony of Mayor S. Halff and the exceptions to the testimony of Samuel L. Bachrach. The motions are so general in their form that it is difficult to pass upon them further than to say that so far as any communications tending to show that Ralph A. Nattans and Lee S. Meyer said anything to bind the defendant the motions should be sustained, as there has been no evidence to show that either of these parties were agents of the defendant.

In regard to the exceptions to the testimony of Samuel L. Bachrach it would hardly be helpful to pass upon each of the separate exceptions again, as they were specifically passed upon when the depositions were read. It may again be ruled, however, that in so far as the conversations relate to matters out of the presence of the defendant tending to bind her to any alleged contract or agreement they will be sustained, as there has been no testimony sufficient to prove the agency of Mr. Meyer or Mr. Nattans for the defendant, so far as fixing the terms of the lease.

This is a case for specific performance which presents somewhat unusual aspects. A demurrer to the bill of complaint having been overruled the plaintiff is entitled to have the relief it seeks, of enforcing the contract of lease if the proof is sufficient to establish such a contract as that set up in the bill, as having been agreed to between the parties.

The business conducted by the plaintiff was started by Arthur Nattans, the husband of the defendant, who at the time of his death was practically the owner of the assets of the company and its stock, and also the owner of one of the buildings in which the business was conducted. The plaintiff company's stock belonged to Mr. Nattans at his death and passed to trustees for the benefit of the widow and her children and the children by a former marriage. Mrs. Nattans and her two sons (Ralph and Arthur), together with S. L. Bachrach, the husband of one of the daughters of Mr. Nattans' first wife, were directors of the company. The property (building) passed upon the death of Mr. Nattans to his wife for life, with remainder to the children. Mrs. Nattans, Mrs. E. T. Dickerson and Mr. S. L. Bachrach were the trustees, who controlled the company's stock. Mrs. Nattans was president of the company, and her son Ralph was the general manager, with large powers and authority in carrying on the company's business. In 1908 a lease was executed by Mrs. Nattans to the company of the building mentioned for the term of ten years, from July 1, 1907, at a yearly rental of $11,000.00 In the year 1914 a fire occurred, which caused a very considerable damage to the stock, fixtures and building. The company at the time was occupying two buildings, one the Nattans buildings above mentioned, and the other adjoining thereto, known as the Hamman building. It desired to continue to occupy both of the buildings. Mrs. Nattans did about this time execute, as president, a lease on behalf of the plaintiff company for the Hamman property, but she failed to execute a lease for the Nattans property. Notwithstanding this failure the improvements contemplated were made out of the company's funds, and checks for said improvements were signed by Mrs. Nattans as president. Subsequently a controversy arose as to the terms of a contract for Ralph A. Nattans as general manager, and eventually Mrs. Nattans and her two sons resigned from the governing body of the plaintiff company, and Mrs. Nattans refused to execute a lease in consideration of obtaining of which the leasee claims to have improved her property.

It would seem manifestly unfair to the defendant to agree to execute a lease, permit her property to be repaired, and then because her son could not obtain the contract for life as general manager, refuse to make the lease, withdraw with her sons from the company and leave it in a helpless condition. In effect to greatly cripple, if not to destroy the company's business. This might be business shrewdness, but if proven should not be tolerated or sanctioned by a court of equity. It might be natural for the mother to favor her own sons in any business matter when there were two

interests to serve, especially in view of her experience with the management of a son of the former marriage, whereby a severe loss had been sustained, but she would not be justified in accepting something for nothing.

A vast amount of testimony has been taken in the case, much of which tends rather to befog the issue than to clarify it. The questions to be determined are whether or not there was an agreement to lease the property mentioned in the proceedings by the defendant to the plaintiff, and if so, whether or not it is such a lease as it set out in the bill, and whether or not the actions of the defendant are such as to amount to a fraud upon the plaintiff, either by accepting the improvements made upon the assurance that she or some one acting for her gave the plaintiff the right to believe that she had assented to giving the lease, or did she by her silence, let the improvements be put upon her property, with the expectation that the lease would be given upon the terms stated.

Both before and during, and after a meeting of the board of directors of the plaintiff corporation, held on October 27, 1914, sundry conferences and correspondence concerning repairs, leases and contracts were discussed by the parties concerned and their respective counsel. All of the parties concerned were present at this meeting of October 27, 1914. What took place at this meeting must largely determine this controversy. A fire had taken place, various plans of improvement had been discussed; insurances had been adjusted or were in process of adjustment. The general manager, Ralph A. Nattans, was the dominating factor in putting the business on its feet. He secured a temporary place of business and looked after adjustments, settlements and new plans. The defendant wished to know all that was being done, so did Messrs. Bachrach and his attorney, Mr. Halff. There was apparent unity and concert of action among the parties until the demand of Mr. Ralph A. Nattans, for a life contract, securing his position and compensation. This last was a burning question, as is evidenced by correspondence and interviews, both before and subsequent to said October meeting. The life of the company demanded immediate action in all these things, as

well as in procuring the lease. It was suggested that if a lease could not be obtained, that the remaining life time of the leasee would justify repairs being made on the property, which was then used by the company for a rental of about $11,000.00. The defendant, who owned the property individually, and her sons controlled the plaintiff company, the future prosperity of which would be materially affected by having a long time lease. She was also one of the trustees of the controlling interest in the company. She had too many masters to serve, but could not she act fairly with all of them as hard as it might be to do? At this meeting of October 27, 1914, the defendant presided as president. The general manager made a report as to insurance adjustments, etc. His salary was fixed according to the recorded minutes for life. The general manager reported that he wanted to spend $30,000.00 in improving and repairing the property, provided the owner turned the insurance (which was done). He was then *"authorized to make an agreement* with Mrs. Jennie Nattans" for the lease set forth in the proceedings which is herein sought to be enforced.

No contract was agreed upon at the meeting. Apart from the statements made by the defendant and other parties present, all of whom say she refused to consent to a lease upon the proposed terms, the statements by Mr. Bachrach, the most active and definite opponent of the defendant, would seem to make that conclusive. In his testimony he says:

"Q. After Ralph has stated what he wanted to do, had the question of the lease at that time been determined?

"A. We took up the lease matter at that time, at this meeting when this proposition was mentioned about the improvements, and we tried to figure out with Mrs. Nattans—she insisted on getting twenty thousand dollars a year out of the property—we tried to show her how by making this lease date from the first of January 1915, that by creating her lease—by creating this lease—giving her sixteen thousand dollars a year for the first four years, and eighteen thousand dollars a year for the second four years, and twenty thousand dollars a year for the third four years, that she would be getting

practically twenty thousand dollars a year, because we were paying an increase on the two years and a half that we were to have the store for eleven thousand dollars.

"Q. When you say 'we' whom do you mean?

"A. The Read Drug and Chemical Company.

"Q. Who were present at the meeting?

"A. Ralph and myself; he was the manager of the business and was supposed to get the lease. He took the figures and went over them with his mother and tried to explain them to her, because Mrs. Nattans, of course, could not get the idea, and—

"Q. What was the result of that argument or discussion that you had with her?

"A. I don't think we came to any decided result. I left with the impression that the lease was going to be drawn up on the plans that we had mapped out.

"Q. What was her chief objection to the renewal?

"A. She continually said that she wanted twenty thousand dollars. That was the only thing in her mind, that she wanted twenty thousand dollars a year.

"Q. By whom was the rental stated in the resolutions of the meeting of October 27th first proposed, I mean these figures of sixteen thousand, eighteen thousand and twenty thousand dollars?

"A. The original proposition came from me, to try and meet her demand for twenty thousand dollars."

During the subsequent discussions, the improvements (costing a large sum of money) ordered at this meeting were under way, even though the lease had not been executed or its terms fixed. The defendant knew that the improvements were being made. She left the details to others, but she knew that the expenditures were more than the insurance which was collected. To continue the business at this stand meant extensive repairs. The old lease had two and one-half years to run at $11,000.00 per year. The lowest figure mentioned in the new proposed lease was $16,000.00 a year or as Mrs. Nattans contended for was $20,000.00. In any event a saving to the company on rental of about $12,500.00 for the life of the old lease even if no new one was obtained. True, Mr. Dickerson prepared a lease, but there is no evidence that Mrs. Nattans approved the final draft or authorized its delivery to the company.

Is there any doubt but that Ralph A. Nattans was in effect promised some sort of a life contract, otherwise the board would not have received the protests of Mr. Bachrach and his counsel at the December meeting, nor would the long correspondence between counsel have taken place. Nor would matters have reached such an acute stage, to require all interests to be represented by counsel at the meeting of December 28, 1914. If all matters were settled at the October meeting as to repairs, leases and contracts, why these discussions? There is no definite or satisfactory evidence that the making of the improvements was dependent upon the obtaining of the lease, save Mr. Bachrach's statement, that he would not have agreed to make them without the lease. Certainly it was well understood that neither lease nor contract were agreed upon prior to the date of Mr. Meyer's letter to Mr. Halff, dated October 12, 1914, in which the way of making definite these things is suggested. No contract or lease seems ever to have been executed. Why should it be concluded that the terms of one was fixed if not of the other?

Unless there be a part performance by an acceptance of the improvements to her property or the assurance that such a lease would be made by the defendant, as the general manager was authorized to make at the meeting of October 27, 1914, certainly nothing occurred at that meeting to indicate that the defendant had agreed to execute a lease upon the terms proposed, unless it be because she was outvoted. All the witnesses concur in saying that she insisted that she have a lease for $20,000.00 a year. The best evidence is her failure to execute the lease, as at that time there was no reason why she would not have done it. Whether it be because the contract with her son was the real preventing cause or not, there is nothing to show that she agreed to a lease or to accept improvements other than what the company wished to make for the purpose of their business.

If a contract for a lease is to be enforced it must be mutual and certain. If the contract depends upon part performance the acts of part performance and acquiescence must be sustained by clear proof.

54 Md., 212, Hopkins vs. Roberts.

123 Md., 600, Caplan vs. Buckner.

There must be a concluded contract and an actual meeting of minds. In view of the positive denial of giving any authority to any one to make a contract for her, and her persistent refusal to execute any but a contract for $20,000.00 a year for all of the life of the proposed lease, can it be said that such agency as would bind her has been established? Even if it be assumed that Ralph A. Nattans promised to have his mother execute such a lease as is alleged in the bill I find no evidence that he had any authority from his mother.

53 Md., 28, Equitable vs. Poe.

There is no evidence to show that the defendant delegated authority to any one to act for her in the matter of the lease. This case does not present such a condition such as was presented in 100 Md., 399, Swindell vs. Gilbert.

It was argued that the silence of the defendant should be taken as an acquiescence in the terms of the lease, and the Carmine vs. Brown case, 104 Md., 198, is cited in support of such contention. In that case there was an undenied "no reply" to an observation of the tenant in regard to cutting his crops. In this case all of the witnesses testify to the *non-silence* of the defendant.

It has been argued very convincingly that the president of the plaintiff company, who was one of the trustees, representing practically the whole stock in the company, who was a director of the company and at the same time was the landlord, should not do anything in any way injurious to the company's interests. This is undoubtedly true, but when these apparent conflicting positions were not entirely of her own making, can a court enforce a contract to which she had not agreed or make a contract for the parties? Would it be unfair to let her as landlord insist upon terms satisfactory to her? If there has been any unfairness or mis-representation on the defendant's part she ought to be liable in another form of action for damages caused, but this is a proceeding to enforce a definite contract. It must be proven.

106 Md., Acker-Merrill-Condit Co. vs. McGaw, 556.

Even if the manipulation alleged whereby Mrs. Nattans has brought about such a condition as to cause a damage to this plaintiff, and the records might indicate that, this court has no power to correct it in this proceeding.

The position of the defendant is a very delicate one. It is impossible to reconcile her conflicting interests. She has done well to retire from the presidency of the company. Unless there is some fraud on her part whereby an interest has been improperly sacrificed, can she be required to give this company her property for a less sum than she thinks it is worth, or for a sum less than she can get for it from another? Whilst it is true her property has been improved and made, as one of the witnesses has said, "one of the finest drug stores in the United States," yet she contributed her insurance collected towards making these improvements. The net cost of repairs and improvements being about the same as the difference between the rental of the old lease and proposed new lease for the remaining life of the existing lease. Weighing all the testimony and applying the law thereto, I am forced to the conclusion that a coming together of the minds had never taken place. Whilst it may be vital to the company to have a new lease, and it might seem unfair for the defendant not to help this company, with which her family have been so long connected, yet it might also seem unfair that the manager, who had so built up the business as to make it very profitable, should be deprived of a sure contract, or that the defendant should not have the present market value for her property.

The case must rest upon the fact of whether or not a contract, such as the one mentioned in the bill has been agreed upon between the parties. Having reached the conclusion that the defendant has agreed to no such contract it cannot be enforced.

The bill will be dismissed.