ALEXANDER SOMERVILLE *vs.* JAMES COPPAGE.

*Specific Performance—Mistake in Written Contract—Omission of Stipulation as to the Time of Performance.*

When the written contract to buy land does not accurately express the terms which one or both of the parties understood to be the real agreement, specific performance will not be granted.

The defendant in a suit for specific performance may show by parol evidence that through the mistake of both or either of the parties, the writing does not express the real agreement, or that the agreement itself was entered into through a mistake as to its subject-matter or as to its terms.

In August, 1903, an agreement was concluded by letters for the purchase by the defendant of plaintiff's farm. Nothing was said in the letters concerning the time when possession of the farm would be given, but the defendant desired it for his immediate personal use and understood

that the plaintiff in their conversations had stated that he could enter into possession on January 1st, 1904. Afterwards defendant found that on account of plaintiff's failure to give notice to quit to the tenant of the farm he could not obtain possession until January 1st, 1905. *Held*, that under these circumstances specific performance will not be decreed against the defendant, since it would be inequitable to compel him to take the property thus encumbered, when such was not the contract he intended to make and thought had been made.

Appeal from the Circuit Court for St. Mary's County (CRANE, J.)

The cause was argued before MCSHERRY, C. J., FOWLER, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Walter I. Dawkins* (with whom were *John B. Gray* and *J. Frank Parran* on the brief), for the appellant.

No appearance for the appellee.

MCSHERRY, C. J., delivered the opinion of the Court.

This is an appeal from the Circuit Court for Saint Mary's County. The proceedings were commenced by a bill in equity filed in that Court on December the thirteenth, nineteen hundred and three, by Alexander Somerville against James E. Coppage. The bill prayed that a decree might be passed requiring Coppage to specifically perform an alleged contract for the purchase by him of a farm owned by Somerville. Upon the coming in of an answer, testimony was taken and finally the Circuit Court, after a full hearing, denied the relief sought and dismissed the bill. From that decree the pending appeal was taken.

Among the exhibits filed with the bill are four letters— three of them having been written by Coppage and one of them by Somerville. Those four letters with one other written by Somerville but not produced though its contents were proved, are asserted to evidence the contract whose specific performance is demanded. They will be considered in a moment. It appears from the evidence contained in the record that Coppage went to Calvert County some time in July, 1903,

to look over and inspect several farms which had been adver-
tised for sale, with a view of purchasing one.    During that
trip he, by accident, fell in with Somerville and the latter upon
learning that Coppage was in quest of a farm informed him
that he, Somerville, had one which he would part with, and a
price was named.    According to the testimony of Coppage,
Somerville stated that possession of the farm would be given
to him on the first of January, 1904.    Somerville flatly denies
that statement and asserts that it was neither made at the time
mentioned by Coppage nor on any other occasion.    Be that
as it may, the matter of obtaining possession at an early date
was unquestionably in the contemplation of Coppage, because
he was anxious to leave Baltimore, where he was then living
at considerable expense, and he desired to return to the coun-
try, from which he had but recently removed with his family
to the city.    His main purpose in buying a farm was to get
back to the country, and it cannot be reasonably doubted that
one of the considerations prominently before his mind and
largely influencing him in negotiating for a purchase, was the
expectation of obtaining an early possession by himself and
his family of the property he might buy.    His object in pur-
chasing was not for investment, but to obtain a home; and as
he was anxious to leave the city he was equally desirous to
take up his abode in the country.    Accordingly on his return
to Baltimore he wrote to Somerville under date of July 27th,
1903, as follows:    "The day I saw you, I went back and
stopped at the house on your farm;    *    *    *    I did not look
it over much.    I will make you an offer as I saw it, and will
give you three thousand and five hundred dollars for it, cash.
Please let me hear from you."    To which letter, the bill states,
Somerville replied, that he would sell the farm for thirty-seven
hundred and fifty dollars.    Then on August the fourth Cop-
page wrote: "Since I heard from you I have been all over the
farm; I find the buildings on the farm in very bad condition,
and will have to be replaced with almost new ones, except the
tobacco house—the dwelling-house will have to be repaired
from bottom to top, even new sills under it.    I can only afford

to give you what I have offered, three thousand five hundred dollars, cash; I am offered two other farms with good buildings on them. If I can't deal with you I will have to look further, and the only thing is the distance from Baltimore. Let me hear from you." On the sixth Somerville replied: "I will accept your offer for three thousand five hundred dollars, cash. I will reserve the crops now growing, and of course pay the taxes for the present year. * * * I am ready to close the matter at once. Let me know your further wishes in the premises." Obviously up to this point there was no perfected and complete contract between the parties. A price in cash had been offered and that price had been accepted. The growing crops and taxes had been alluded to by the vendor and whilst he expressed his readiness to close the deal at once he requested the prospective vendee to make known his *further* wishes in the premises. The proposal respecting the growing crops had not been agreed to and if Coppage had the right to submit other or "further wishes in the premises," that right could only have existed by reason of the negotiations being still open and unclosed. This is confirmed by the letter written by Coppage on August the seventh. It is in these words: "Your letter at hand saying you will take my offer for the farm, and I consider it a sale, and will comply as soon as I hear that a proper deed can be given, and the title all right, and you will hear from me the early part of next week, and I am ready to pay *as soon as things are satisfactory to me.*" Now, what things were to be satisfactory to Coppage? There were but two things to which allusion had been made but which had not been agreed to; and these were the title and the date of getting possession. According to the testimony of Coppage, when examined in chief, he asked Somerville about getting possession of the farm and Somerville promised to see his counsel, Mr. Gray, in regard thereto. When Somerville was recalled to the stand he distinctly denied that Coppage "ever mentioned such a thing to me *that day.*" He then went on to detail the conversation which did take place, according to his recollection, on the day indicated. Coppage later on asked

to have the testimony given by him read over to him, and when that was done he stated that he wished to make some corrections in the report of it. He then stated that the con- versation in regard to possession occurred on the occasion of his second visit to the farm and that Somerville then told him there would be no trouble about getting possession in Janu- ary, 1904. On August the fifteenth Coppage wrote the fol- lowing letter to Somerville: "Since I came home, I have thought over the matter, and you promised to go to see a lawyer in regards to getting possession of the farm the first of January, 1904. If I can get possession at this time, I will take the farm, and I will come right down and fix up matters as soon as I hear from you. I don't care for the farm if I have to wait another year (1905). Please let me hear from you soon." No reply having been received by Coppage, he wrote on August the nineteenth again, and after alluding to a pre- vious letter of Somerville's, and observing that he supposed Somerville did not get the prior letter of the fifteenth, reiter- ated his statement respecting the time of securing possession. In this letter of the nineteenth, referring to the previous one of the fifteenth, Coppage said: "I wrote that I wanted posses- sion of the farm on January first, 1904, and if I had to wait until January 1st, 1905, I did not want it; I also asked you to reply, and said I was or am ready to comply as soon as you give me title and possession of the farm. Awaiting your reply, I am." Neither of these letters appears to have been answered; but later on a letter written by Somerville's attor- ney was received by Coppage demanding a compliance with the alleged contract of purchase; and finally the pending bill was filed with the object heretofore stated.

There ought to be no controversy over the equitable prin- ciples applicable to the condition of facts above set forth. Even when a particular contract falls under a class in which the equitable jurisdiction invoked in all applications for spe- cific performance *may* be exercised, the right to that relief upon that contract, is not absolute, like the right to recover a legal judgment. 3 *Pom. Eq.*, sec. 1404. The granting of the

equitable remedy is said to be a matter of discretion—not of an arbitrary, capricious, discretion—but of a sound judicial discretion, controlled by established principles of equity, and exercised upon a consideration of all the circumstances of each · particular case. *Ib.* The principle that the specific performance of contracts is not a matter of right, but rests within the discretion of the Court, does not mean that the Court may arbitrarily direct one contract to be performed and refuse the relief in the case of another, but it means that the Court takes into consideration the conduct of the plaintiff, and all the circumstances of the case, and the mere fact that a valid contract exists is not conclusive in the plaintiff's favor. *Bamberger* v. *Johnson*, 86 Md. 38. It is also settled that specific performance will not be decreed of a written contract to buy land, which on account of a mistake, does not accurately express the terms really agreed upon by the parties. *Kraft* v. *Egan*, 78 Md. 36. It is a well established rule that in suits for the specific performance of agreements, even when written, the defendant may, by means of parol evidence, show that through the mistake of both or either of the parties, the writing does not express the real agreement, or that the agreement itself was entered into through a mistake as to its subject-matter, or as to its terms. In short, a Court of equity will not grant its affirmative remedy to compel the defendant to perform a contract which he did not intend to make, or which he would not have entered into had its true effect been understood. 2 *Pom. Eq.*, sec. 860.

It is not worth while to multiply citations in support of these self-evident and elementary principles; and nothing further remains to be done in finally disposing of the pending contention that to apply those principles to the facts already stated.

Notwithstanding the circumstance that the contract as evidenced by the letters preceding the one of August the fifteenth, is wholly silent on the subject of possession, it cannot be questioned, after the record has been examined, that the *time* at which Coppage could obtain possession of the farm was a very material consideration with him. It was one of

the chief or controlling inducements which prompted him to open negotiations for the purchase of a farm.    If this be so— as it is—and if, in addition Coppage supposed, whether mistakenly or not is altogether immaterial, that Somerville agreed to give possession of the property on January the first, 1904; then, when it turned out that the vendor, because of a failure to notify the tenant to quit, was unable to dispossess the latter until January, 1905; it would be both unjust and inequitable to require the purchaser to pay for the property and to take it thus encumbered. A Court of equity will not grant its affirmative remedy to compel a defendant to perform a contract which he did not intend to make, or which he would not have entered into had its true effect been understood.    It may be conceded that the contract actually concluded and closed between the parties, as evidenced by the writings prior to the letter of August fifteenth, made no reference to or provision for possession at all, and yet in spite of this, if Coppage understood—as he manifestly did—that he was to get possession at a certain date, he should not be compelled to take the farm, after discovering that it was impossible for the vendor to deliver possession until a year later than that day.    If the vendee were forced to pay for the farm now, he would not get what, according to his conception of the transaction, he supposed he would get.    As in proceedings of this kind the Court takes into consideration all the circumstances of the case, notwithstanding a valid written contract may exist; it is competent to inquire whether under those circumstances it would be just to grant the relief sought.    It scarcely needs a discussion to show that it would be exceedingly unjust to force upon a vendee who was mistaken in respect to a material element of the contract, the property which he never would have consented to purchase if he had not been thus mistaken.

Though the decree dismissing the bill was founded by the Circuit Court upon another and a different ground, we shall affirm it for the reasons we have assigned.

*Decree affirmed with costs above and below.*

(Decided June 22nd, 1905.)