# HARRY L. CAPLAN

*vs.*

# LOUIS BUCKNER.

*Specific performance of contracts: title of vendor; subsequently acquired.*

For specific performance of a contract to be decreed, the contract must be fair, reasonable, *bona fide,* mutual and definite, and certain in its terms.                    p. 599

But a court of equity will not enforce a contract which does not express the intention of the parties, or which is the result of the mistake of either or both of them.          p. 600

The rule that specific performance of a contract is not a matter of right, but rests in the discretion of the court, refers to the sound "judicial discretion controlled by established principles of equity, and exercised upon a consideration of all the circumstances of the case."          p. 600

When an agreement shows that the vendor had not at the time a clear and unencumbered title, but was to acquire it, and then convey a clear title, if the vendor is able to give such a title at the time appointed by the settlement, the contract is not lacking in mutuality, and, if not otherwise objectionable, is one that may be specifically enforced.          p. 601

In such a case, where no time is named for the consummation of the contract, a court of equity will presume that a reasonable time was meant.          p. 602

On a bill for a specific performance of a contract of sale, where the defendant set up the defense that there was a ground rent upon the property, while he understood that the title was to be in fee simple, it was *held,* that the fact that the defendant had purchased a number of properties in the neighborhood, subject to ground rents, including property on the same street and adjoining that of the plaintiff, his explanation of why he supposed the property was in fee and did not make any inquiry about it, and the fact that the attorney who was employed to

examine the title for him knew that it was leasehold property,
and the further fact that the defendant had in his possession
the unsigned agreement prepared by the plaintiff's counsel,
which disclosed that the property was subject to a ground rent,
would at least suggest some doubt as to the accuracy of the
defendant's statement, that the agreement was that the property
was to be conveyed in fee simple; and it was further *held*, that
his evidence was not sufficient to overcome the positive evi-
dence of the plaintiff, that he told the defendant the property
was subject to a ground rent of $40.00.                  p. 599

*Decided June 25th, 1914.*

Appeal from the Circuit Court of Baltimore City.
(DUFFY, J.)

The cause was argued before BOYD, C. J., BRISCOE,
BURKE, THOMAS, PATTISON, URNER and CONSTABLE, JJ.

*Julius H. Wyman* and *M. Albert Levinson,* for the appel-
lant.

*David Ash* and *Louis Hollander,* for the appellee.

THOMAS, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court of
Baltimore City requiring performance of a verbal contract
of sale of a leasehold property in said city.

In 1912, the appellee, plaintiff below, owned the property
known as number 914 Watson Street, and the appellant
owned and occupied as his place of business the adjoining
property, number 915 Baltimore Street.

According to the plaintiff's testimony, in February, 1912,
he received through his daughter a telephone message that
the defendant wanted to see him about 914 Watson Street.
He went to see the defendant the next day, and the defend-
ant wanted to know if he would sell him the property at a
reasonable price or rent it to him. He told the plaintiff that

he did not have enough room in his own property, and that he wanted the plaintiff's property as a place to store his goods. The plaintiff told him he would rather sell the property. The defendant asked him what he would take for it, and the plaintiff told him $2,000. The defendant then asked him "if it was in fee or had a ground rent," and the plaintiff replied, "it is subject to a ground rent of $40 a year, payable $20 every six months." The defendant said he had purchased the property on Watson Street adjoining the plaintiff's property and subject to the same ground rent for $1,500, and that he would pay the plaintiff the same price for his property, but would not pay $2,000. The plaintiff told him .that the property he purchased had a store front while the plaintiff's property had marble trimmings and would make a nice home, and that if the defendant converted his property into a dwelling it would cost him more than the plaintiff asked for his property. The defendant said that if he purchased the property he would rebuild, and if the front brick and marble trimmings were of any value to the plaintiff he would let him have them. The plaintiff finally told the defendant that he would take $1,800 for the property, but he declined to purchase it at that price. As the property was then vacant, the defendant asked him if he would not rent it to him until after the "Hebrew Holidays," that is, "until the last part of April or May," and said that at that time he would be prepared to make him a better offer, and that it would be worth $10 a month to him in the meantime for the purpose for which he wanted to use it. The plaintiff, in view of the fact that the defendant only wanted the property for a short time, and with the hope of getting a better offer for it from him, rented it to him for $10 per month. In June the defendant notified the plaintiff that he was through with the property and requested the plaintiff to come to see him. The plaintiff went to see the defendant and they agreed upon the terms of sale, which were that the plaintiff would convey the property to the defendant subject to the ground rent of $40, clear of all liens

or incumbrances, for $1,600, $600 of which was to be paid cash on the day of settlement, and the remaining $1,000 to be secured to the plaintiff by a mortgage of the property. At the time this agreement was made the plaintiff told the defendant that there was a building association mortgage on the property which would have to be released. The defendant employed Mr. M. Albert Levinson to examine the title, and the plaintiff gave him a reference to his title. In making the examination Mr. Levinson discovered that there was another mortgage on that and a number of other properties, spoken of in the testimony as the Cronhardt mortgage, which the plaintiff did not know of. When Mr. Levinson informed the plaintiff of the existence of this mortgage the plaintiff went to see the defendant and told him of it and told him that he would see the mortgagee for the purpose of having the mortgage released as to his property. It was then arranged that the settlement for the property would be made a month later, about the first of August. The plaintiff went to see about the Cronhardt mortgage and the mortgagee refused to release it unless the entire mortgage debt was paid. The plaintiff then saw the defendant and told him what the mortgagee had said, and that it would be some time before he could secure the release. The defendant then suggested that he would take possession of the property as the purchaser and owner, and continue in possession of it until the plaintiff could give him a good title, clear of all incumbrances, and would in the meantime pay the plaintiff interest on the purchase price of $1,600, and all expenses on the property, including the ground rent, taxes and water rent, and that as soon as the plaintiff could give him a clear title he would pay the $1,600 in the way that they had previously stated, and the plaintiff agreed to that arrangement and to give him a good title to the property. Foreclosure proceedings were instituted on the Cronhardt mortgage, and the plaintiff was not able to secure a release of the mortgage as to his property until the following May. In the meantime several persons approached him with the view of buy-

ing or renting the property, and in February, 1913, he went to see the defendant and wanted him to pay him six months' interest on the purchase price and the expenses for six months, showing him at the time a memoranda of the six months' interest, ground rent, taxes and water rent, amounting to $82. At the same time he suggested to the defendant that they should have their agreement reduced to writing, and the defendant told him to have the agreement prepared. The plaintiff did so and took the agreement, which was prepared in duplicate, to the defendant and proposed to him to execute them. The defendant told him that he did not have time that day, and asked him to come back "day after tomorrow." The plaintiff went to see the defendant again as he requested, and the defendant told him that he did not understand "much about agreements," that he preferred to show it to Mr. Levinson, and that he would not do anything until Mr. Levinson saw it. The plaintiff went to see the defendant again and defendant told him that Mr. Levinson had promised him to come in but had not been there yet. The plaintiff got tired of the matter being postponed, and went to see the defendant in March and said to him, "this is not business," and the defendant replied, "well you can take my word of honor that I am so awful busy that I don't know what to do first, leave the thing go until after Easter and you will have my assurance that you will not be bothered or have any trouble with me, everything will be all right and settled up and adjusted in regard to expenses." About the last of May the plaintiff succeeded in getting the Cronhardt mortgage released, and he then went to see defendant and told him that he was ready to give him a clear title to the property. The defendant told him that he would see Mr. Levinson, and offered the plaintiff some money on account of the expenses we have mentioned, but as they had agreed on the last of June as the date for the transfer of the property and final settlement, the plaintiff told the defendant that he could wait that much longer for the amount due on account of the expenses. The plaintiff reminded the

defendant that he would have to have the cash payment of $600.00 on the day of settlement, as he had arranged to turn that over to the building association on account of its mortgage, which was to be released as to the property to be conveyed to the defendant, and the defendant said he would give him $100 on account of the "purchase price then." He gave the plaintiff his check for $100 and told his bookkeeper to write a receipt for $100 "on account of purchase price for 914 Watson Street," which the plaintiff signed. The defendant told the plaintiff to come in in about a week and he would give him some more money, and when the plaintiff went to see him as suggested he gave the plaintiff another check for $100 and took from him a receipt like the one he signed before. The plaintiff further testified that when the defendant gave him the second check the defendant told him that but for his agreement to purchase the property he would not buy it; that the conditions had changed; that when he agreed to purchase it he had made arrangements to have it torn down and to rebuild it and his adjoining property, but that he had since concluded that he did not have to make any alterations in the building, and that the defendant further said to him that as "there was nothing signed" he would be satisfied if the plaintiff would release him from the purchase, and that he would give him the $100; that he told the defendant that he had purchased a property, and that he had arranged to use the mortgage that he was to get from the defendant in paying for it, and that he, plaintiff, could not very well get out of that agreement. The deed for the property in question was prepared by Mr. Levinson; the mortgage and mortgage notes were prepared by the plaintiff's counsel; arrangement was made for the release of the building association mortgage, and according to the agreement of the plaintiff and defendant they and their counsel met at the office of Mr. Levinson on the 30th of June to close the matter. In going over the items of expenses from the date of the agreement in August, 1912, to the day of settlement, when they came to the item of

ground rent the defendant insisted that he did not buy the property subject to a ground rent, and that the agreement was that he was to have the property clear of incumbrances, and he declined to take the property.

According to the testimony of the defendant he rented the property from the plaintiff in the spring of 1912, to be used as a place in which to store his goods during the Easter season, which was his busy season, and after that season was over he surrendered the property about the last of April. The plaintiff then came to see him and wanted him to buy the property for $2,000. He refused to take the property at that price, and told the plaintiff that all he wanted was the lot. In June the plaintiff told him that he would take $1,600 for the property provided he got the material, and he told the plaintiff that he did not think he would need the material and that he, plaintiff, could have it. He agreed to purchase the property for $1,600, and to pay $600 cash and to give a mortgage for the balance. The plaintiff did not say anything to him about the property being subject to a ground rent. He employed Mr. Levinson to examine the title, and several weeks later Mr. Levinson notified him that foreclosure proceedings had been instituted on the Cronhardt mortgage. On the 4th or 5th of August the plaintiff came to see him and told him of the difficulty about the Cronhardt mortgage, and said he was going to try to get rid of the difficulty, and that if the defendant wanted to do so he could continue to occupy the property, and that if the plaintiff could arrange to give him a good title to the property, the defendant could pay in addition to the purchase price the interest thereon and the expenses on the property in the meantime, and that if he was not able to give the defendant a title clear of all incumbrances he could pay rent as he had before. The defendant estimated that the interest, taxes and water rent would amount to about the same as the rent he had previously paid, and he agreed to the arrangement suggested by the plaintiff, and accordingly took possession of the property on the 4th or 5th of August, 1912. About

eight months later the plaintiff told him he would "soon be
through with the difficulty with the Cronhardt mortgage
"and be ready to settle," and about a month later the plain-
tiff told him that he was then ready to settle. Mr. Levinson
called his attention to the other mortgage on the property,
and the plaintiff wanted the defendant to give him $500 and·
let the mortgage remain on the property, which he refused
to do. About the last of May the plaintiff went to see the
defendant and told him he was ready to settle, and asked
him to help him out and give him a little money. The de-
fendant told him that he owed him some money anyhow and
had just as well, give him $100, and if the deal went through
it could be deducted, and if the deal did not go through it
could be credited on the rent. The defendant gave him his
check for $100. Three days later the plaintiff asked the
defendant to give him $200, and the defendant told him that
that would be too much, as his rent would not amount to
that if the deal did not go through. The plaintiff asked him
if he was not good for that much, and the defendant replied
that he "was good for some money," and then gave him an-
other $100, because, as he says, it was his busy season and
he "was too busy to look into it." Sometime before he gave
the plaintiff the money referred to, on one occasion he came
home from a trip to Norfolk and his bookkeeper told him
that the plaintiff had left an agreement for him. He did
not look at the agreement and did not want to see it, and
when the plaintiff came in a few days later he told him he
did not want to enter into any further agreement, and that
all he wanted was the property according to their agreement,
and that he would then pay for it, and the defendant says
that if he had read the agreement, and had seen any men-
tion of the ground rent, the trouble would have "started right
there." In reply to the question, "Was at any time the word
'ground rent' mentioned?" He replied, "Never, to under-
stand it, that it was ground rent."

The evidence further shows that the defendant had pur-
chased and owned a number of properties subject to ground
rents; that he was familiar with the ground rent system in
Baltimore, and that the deed for the property, which was
prepared by defendant's counsel about the time he examined
the title in 1912, described the property as subject to a
ground rent of $40. It is true, the defendant says that he
never saw the deed, and his counsel states that he did not
show it to him or tell him of the ground rent. But it seems
that he had a number of interviews or communications with
his counsel in regard to the title to the property between the
time the deed was prepared in 1912 and the date fixed for
the final settlement in June, 1913, and it would be rather
remarkable if nothing was said from which he might have
inferred that there was a ground rent on the property, even
if it did not occur to him to inquire about it. The defend-
ant does not say that the plaintiff told him that the property
was not subject to a ground rent, and when the Court stated
to him that as he was familiar with the ground rent system
in Baltimore and owned the adjoining property on Watson
Street which was subject to the same ground rent, the Court
would like to know why it was he did not ask the plaintiff
if the property was in fee or subject to a ground rent, he
replied that in all his dealings the "word 'ground rent' was
always mentioned," and that there was no occasion in this
case to ask about the ground rent because he was only buy-
ing the ground and the plaintiff was to get the material.
In his answer to the bill, however, he admits that he agreed
to purchase the property for $1,600, but no where states, as
a part of that agreement, that the plaintiff was to have the
material in the building. He further states in his answer
that he agreed to pay the expenses that would accrue pend-
ing the litigation in regard to the Cronhardt mortgage as
rent, and that he paid the $200 "on account of rent," yet
according to his testimony the rent for the entire year would
have been only $120, and he does not deny that he required

the plaintiff to sign a receipt for each payment stating that it was on account of the purchase price. The agreement was not produced at the trial, and when it was demanded by the plaintiff, counsel for the defendant stated that he had never seen it and that the defendant had never seen it, and the defendant testified that he told his bookkeeper to destroy it.

The only evidence in the case tending to show the terms of the verbal agreement is the testimony of the plaintiff and the defendant. The fact that the defendant had purchased a number of properties subject to ground rents, including the property on Watson Street adjoining the property of the plaintiff; his explanation of why he supposed the property was in fee and did not make any inquiry about it; the fact that the attorney who was employed to examine the title knew in June, 1912, that it was leasehold property, and the further fact that the defendant had in his possession the unsigned agreement prepared by the plaintiff's counsel which disclosed that the property was subject to a ground rent, would at least suggest some doubt as to accuracy of his statement that the agreement was that the property was to be conveyed to him in fee, and in our judgment his evidence is not sufficient to overcome the positive testimony of the plaintiff that he told him that the property was subject to a ground rent of $40. In this view we are supported by the conclusion of the learned judge who heard the case in the Court below and who had the advantage of seeing the witnesses, and was aided in judging of the accuracy of their recollections and testimony by the manner in which they testified.

We have carefully examined the authorities referred to by counsel for the appellant, and do not find any legal difficulty in granting specific performance of the agreement. It possesses all the elements necessary to entitle the plaintiff to the aid of a Court of Equity. The contract was fair, reasonable, just, *bona fide*, mutual and definite and certain in its terms; the defendant admits that he entered into posses-

sion of the property under it, and the evidence shows that he paid a part of the purchase price. *Duvall* v. *Myers*, 2 Md. Ch. 401; *Geiger* v. *Green*, 4 Gill, 472; *Gelston* v. *Sigmund*, 27 Md. 334; *Hopkins* v. *Roberts*, 54 Md. 312; *Spear* v. *Orendorf*, 26 Md. 37; *Goldman* v. *Brinton*, 90 Md. 259; *Miller's Eq. Proc.*, sects. 679-711; 36 *Cyc.* 654. It is undoubtedly the rule in this State that a Court of Equity will not enforce a contract which does not express the intentions of the parties, or is the result of the mistake of either or both of the parties. *Kraft* v. *Egan*, 78 Md. 36; *Somerville* v. *Coppage*, 101 Md. 524. But in this case the evidence does not show that the agreement was the result of a mistake on the part of the defendant. On the contrary, we think it shows that he knew that there was a ground rent on the property. The fact that he now says that he did not know it cannot determine the plaintiff's right to relief, for otherwise there could be no enforcement of a contract where there is a conflict of evidence as to its terms. The Court must find from all the evidence that there was a mistake, and that the contract executed or entered into by the parties does not express the real agreement. The rule that the specific performance of a contract is not a matter of right, but rests in the discretion of the Court, refers to a "sound judicial discretion, controlled by established principles of equity, and exercised upon a consideration of all the circumstances of each particular case." *Somerville* v. *Coppage*, *supra*.

There is no force in the suggestion that the contract was lacking in the element of mutuality. The agreement was that the plaintiff would convey to the defendant a good title to the property, subject to the ground rent, but clear of all incumbrances, and at the time appointed for the settlement he was ready and able to comply with that agreement. The fact that there was a mortgage on the property and they agreed that the defendant should have possession of the property and pay the expenses until the plaintiff secured a re-

lease of the mortgage did not destroy the binding force of the contract. It is said in *Miller's Equity Proc.*, sec. 686: "When the agreement shows that the vendor has not, at the time, a clear and unincumbered title, but is to acquire it, and then convey, if he is able to give a clear title at the time when by the equities of the particular case he is required to execute the conveyance in order to entitle himself to the consideration, there will be no obstacle to a specific enforcement by the vendor." *Canton Co.* v. *B. & O. R. R. Co.*, 79 Md. 424. And in the case of *Md. Construction Co.* v. *Kuper*, 90 Md. 529, JUDGE BOYD, after referring to a number of cases, says: "The authorities are therefore ample to establish the doctrine that the mere fact that the vendor's property is incumbered, or his title defective, at the time the contract of sale is made, will not prevent his enforcing the contract in equity, if he has removed the incumbrance and perfected the title by the time he is required by his contract to convey it, and, generally, when he has acted in good faith relief will be granted him, if he is ready to furnish a clear title at the time of the decree, provided the delay has not prejudiced the purchaser and time is not of the essence of the contract. If it were not so, an owner of land who has incumbrances upon it, might pay them off for the purpose of giving the purchaser a clear title and then not be able to enforce the contract of purchase, or he might be subjected to heavy costs in order to have his title cleared and then not be able to require the purchaser to perform his part of the contract." In the case at bar the contract was that the plaintiff would give the defendant a title to the property, subject to the ground rent, but clear of all incumbrances, and agreed that the defendant should have the possession and use of the property, upon the terms stated, until he secured the release of the Cronhardt mortgage. The defendant was in no way prejudiced by the delay, and it would operate as a hardship upon the plaintiff to now hold that he cannot enforce the agreement.

The agreement did not specify the time in which the mortgage for $1,000 was to be made payable, but that does not render the terms of the contract too indefinite within the rule referred to. In *Triebert* v. *Burgess,* 11 Md. 452, the Court said: "Another objection to the contract is, that it cannot be specifically enforced, because it is too indefinite, inasmuch as no time is limited for the payment of the mortgage; and as the parties have agreed upon none the Court cannot undertake to fix it. Such an objection is not a valid one. In *Farrell* v. *Bean,* 10 Md. 233, this Court said: 'When no particular time of payment is limited in a mortgage, it is to be paid in a reasonable time. And if payment is not so made, the mortgagee is entitled to a foreclosure.' " That case is cited and approved in *Lawson* v. *Mullinix,* 104 Md. 156, where the Court held that when no time is fixed for the consummation of a contract, a Court of Equity will require it to be consummated in a reasonable time. The mortgage which was prepared by the authority of the defendant to carry out the terms of the agreement in this case was made payable one year after date, and no objection was made to it on that account.

The record shows that about two months after the decree of the Court below was passed, the defendant filed a petition in the case, and with it the agreement which the plaintiff stated he delivered to the defendant in February, 1913, and which the defendant failed to produce at the trial. The property in question is referred to therein as leasehold property, but as the paper was not filed until after the decree appealed from it cannot be considered by this Court.

For the reasons stated we will affirm the decree of the Court below.

*Decree affirmed, with costs to the appellee.*