The PRESIDENT AND COUNCIL OF MOUNT SAINT MARY'S COLLEGE

v.

The AETNA CASUALTY & SURETY COMPANY, Defendant,

and

W. Harley Miller, Inc., Intervening Defendant.

W. HARLEY MILLER, INC., Counter-Plaintiff,

v.

The PRESIDENT AND COUNCIL OF MOUNT SAINT MARY'S COLLEGE, Counter-Defendant.

Civ. No. 14180.

United States District Court
D. Maryland.

Sept. 3, 1964.

George Cochran Doub, Robert D. Klages, Weinberg & Green, and Joseph M. Wyatt, Wyatt & Jones, Baltimore, Md., for plaintiff.

Richard W. Emory, William J. McCarthy, and Venable, Baetjer & Howard, Baltimore, Md., for defendants.

THOMSEN, Chief Judge.

This is an action against a surety on a bid bond to recover the penalty thereof, wherein the low bidder, W. Harley Miller, Inc. (Miller, Inc.), the intervening defendant, seeks relief on the ground of mistake from any obligation created by its bid, cancellation of its bid, and return of the bid bond. The mistake consisted in the failure of Miller, Inc., to include in its Base Proposals certain Separate Price Quotes for kitchen and snack bar equipment, built-in furniture, etc.

Each of the parties is a citizen of a different State and the requisite amount in controversy exists. 28 U.S.C.A. § 1332.

## Findings of Fact

In 1961 plaintiff (the College) acting through its architects, May and Ruppert (the Architects), issued an invitation for bids to construct a student union building and a dormitory building on its campus at Emmitsburg, Maryland. The project was financed by the Federal Housing and Home Finance Agency (HHFA), which had agreed to purchase $1,400,000 of bonds of the College secured by a deed of trust, based upon the Architects' estimate of costs. The original loan agreement required the College to deposit in the construction account $360,000 over and above the loan from HHFA. Under the loan agreement the College was obligated to contract for the work upon free, open and competitive bidding, and to award each contract after approval by HHFA to the lowest responsible bidder as soon as practicable.

The bidding documents, which contained the usual general provisions, provided for three Base Proposals: (A) Combined bid for the construction of the Student Union Building and the Dormitory Building; (B) Student Union Building only; and (C) Dormitory Building only. The College reserved the right to reject any or all bids, and if the lowest bid submitted by a responsible bidder exceeded the amount of funds available to finance the contract, to reject all bids or award the contract on the base bid modified by certain deductible alternates. The Instructions to Bidders provided that any bid might be withdrawn prior to the scheduled time for the opening of bids, but that no bidder might withdraw a bid within thirty days after the date of the opening.

Each bidder was required to post a bid security bond in the amount of 10% of its bid, and the bidding documents provided that if a successful bidder should fail or refuse to execute and deliver the contract and bond within ten days after receipt of written notice of the acceptance of its bid, the bid security should be forfeited to the College as liquidated damages.[1]

On July 19, 1961, Miller, Inc., through its estimator, Francis M. Jenkins, Jr. (Jenkins), requested permission of the Architects to bid on the project, filed with

---

1. Paragraph IB-7 of the Instructions to Bidders reads as follows:

   "LIQUIDATED DAMAGES FOR FAILURE TO ENTER INTO CONTRACT:

   "(a) The successful bidder, upon his failure or refusal to execute and deliver the contract and bonds required within 10 days after he has received notice of the acceptance of his bid, shall forfeit to the Owner, as liquidated damages for such failure or refusal, the security deposited with his bid."

   The Form of Bid provided on the last page before the signature of the bidders is as follows:

   "Upon receipt of written notice of the acceptance of this bid, Bidder will execute the formal contract attached within 10 days and deliver a Surety Bond or Bonds as required by Paragraph 29 of the General Conditions.

   "The bid security attached in the sum of _____ _____ ($_____)
   is to become the property of the Owner in the event the contract and bond are not executed within the time above set forth, as liquidated damages for the delay and additional expense to the Owner caused thereby."

   Since the Specifications were prepared by the Architects for the College, any ambiguity must be resolved against the College; it appears, however, that the reference to notice in IB-7 should be construed to mean a written notice such as is provided for in the Form of Proposal signed by the several bidders.

the Architects a prequalification statement, satisfied the Architects of its qualifications and received from them a complete set of the bidding documents, including the specifications and drawings. Eight other contractors received the bidding documents, and six of them submitted bids.

The Form of Proposal for the submission of bids, prepared by the Architects, after providing for Base Proposals for the construction of the buildings, contained the following provisions requiring the bidders to furnish prices for certain Separate Price Quotes and for fifteen Alternate Proposals:

"DEDUCTIBLE (Include these prices in the base bid)

"SEPARATE PRICE QUOTES:

"1. *Kitchen and Snack Bar Equipment, Refrigerators & Refrigeration, DIV 65 of Specifications complete,* Student Union Bldg. (Separate bids will also be received by the Owner for the kitchen and snack bar equipment.)

"(a) Furnish and install new kitchen and snack bar equipment, etc., as specified and shown on kitchen and snack bar drawings. Disconnect, move and install existing kitchen and snack bar equipment as specified and shown on kitchen and snack bar drawings.

"NOTE: All costs for capping off and necessary revamping of plumbing and finishing or patching of surfaces in area from which existing kitchen and snack bar equipment is removed, shall not be a part of the contract. Submit this cost separately.

"For the sum of _____ ($_____)

"(b) *Install* the kitchen and snack bar equipment as specified and shown on kitchen and snack bar drawings, which will be furnished by the Owner.

"For the sum of _____ ($_____)

"2. Built-in-Furniture-Dormitory (Student Units and Prefect Units.) (Separate bids will also be received by the Owner for the Built-in-furniture). (State which option (qualify) of the specification you choose.)

"(a) Furnish and install built-in furniture (Student bedroom units and Prefect bedroom Units) as specified and noted as N.I.C. on the drawings.

"For the sum of _____ ($_____)

"(1) Unit Cost (Breakdown per room)
Student bedroom units

"For the sum of _____ ($_____)

Prefect bedroom unit

"For the sum of _____ ($_____)

"ALTERNATE PROPOSALS: (Student Union Building) DEDUCTIVE

"Alt. No. 1 Fireplace complete including chimney, install stacked concrete masonry units (painted) for continuation of wall.

"Deduct the sum of _____ ($_____)"

The form of each of fifteen Alternate Proposals was the same as the form of "Alt. No. 1".

The Form of Proposal was amended by Addendum No. 2, dated July 31. Paragraph 24 thereof amended Items 1(a) and (b) of the Separate Price Quotes to read as follows:

"(a) Furnish *new* Kitchen, Cafeteria and Snack Bar Equipment, etc., as specified and shown on Kitchen and Snack Bar drawings.

"For the sum of _____ ($_____)

"(b) Costs for capping off and necessary revamping of plumbing and finishing or patching of surfaces in areas from which existing Kitchen and Snack Bar equipment is removed.

"(NOTE: This cost shall not be a part of this contract.)

"For the sum of _____ ($_____)."

———◆———

Addendum No. 2 noted that the price for Item 1(a) should include "furnishing *new* Kitchen equipment *only*" and that the word "install" was being omitted. The explanation given was that "roughing-in and installation are covered in other DIVISIONS under General Contract. See Plumbing and Electrical." The Specifications did not provide explicitly elsewhere for installation of the kitchen and snack bar equipment by the general contractor. The College reserved the right to obtain and did obtain from suppliers on the day before the construction bids were due, separate prices for the built-in furniture and for the kitchen equipment.

Upon the opening of the sealed bids at the office of the President of the College in Emmitsburg at 2 p. m. on August 8, the bid of Miller, Inc., was found to be the low bid for the combined construction of the Student Union and Dormitory Buildings, namely, $1,389,450; its separate bid ($734,450) for the Student Union Building only was also low; as was its separate bid ($659,450) for the Dormitory Building only. The other bids were as follows:

|  | Combined Bid | Student Union | Dormitory |
|---|---|---|---|
| Frederick Construction Co. | $1,478,064 | $815,064 | $700,064 |
| Lawrence Construction Co. | 1,483,987 | 783,428 | 703,871 |
| Henry A. Knott, Inc. | 1,490,000 | 765,000 | 732,000 |
| Altimont Brothers, Inc. | 1,498,000 | 788,400 | 723,000 |
| Joseph F. Nebel Co. | 1,567,000 | No bid | No bid |
| J. B. Ferguson & Co., Inc. | No bid | No bid | See Note 3 |

———◆———

In filling out the Form of Proposal and submitting its bids, Miller, Inc.—

quoted $84,000 as the cost of Separate Price Quote 1(a), for kitchen and snack bar equipment for the Student Union Building;

quoted $1,000 as the cost of Separate Price Quote 1(b), as the cost of capping off and revamping of plumbing and finishing; and

quoted $85,000 as the cost of Separate Price Quote 2(a), for built-in

furniture for the Dormitory Building.

Both W. Harley Miller (Miller), president and principal stockholder of Miller, Inc., and Jenkins, its estimator, interpreted and construed the Form of Proposal as not calling for the inclusion of the Separate Price Quotes in the Base Proposals, and Miller, Inc., did not include any of these Separate Price Quotes in its Base Proposals for the construction of the buildings.[2]

The Architects and the College intended the form of Bid Proposal and the Specifications to mean that the kitchen equipment and the built-in furniture, for which Separate Price Quotes were requested, should be included in the Base Bids for the Student Union Building and for the Dormitory Building, respectively, and in the Combined Base Bid for both buildings. All of the bidders except Miller, Inc. so interpreted the bidding documents and considered that these special equipment items were included in their Base Bids; all of their bids were prepared and submitted on that basis.[3]

The Architects received no written requests for interpretation of the documents in this respect, and the Addenda were not issued pursuant to a request by any bidder.

When Miller and Jenkins first read the portion of the Proposal quoted above they were somewhat confused by the form and language of those provisions, but when they examined the entire Proposal, including the Specifications and the Drawings, they became satisfied that the proper interpretation of the provisions in question was that the Separate Price Quotes should be bid entirely separately and should not be included in the Base Bids. They relied upon the reasons set out in note 4, below, and upon the fact that the practice of having separate price

2. The letter by which Miller, Inc. invited bids from sub-contractors and suppliers stated: "General contract includes all trades except kitchen equipment and built-in furniture." Jenkins did not include any item of cost of kitchen and snack bar equipment in his cost estimate of $667,603 for the Student Union Building and did not include any item of cost for built-in furniture in his cost estimate of $592,435 for the Dormitory Building. Miller computed and determined his company's Base Proposal of $1,389,450 for both buildings by rounding and reducing the cost estimate for the Dormitory Building to $590,000, which gave a cost estimate of $1,250,000 for both buildings, to which he added $140,000 (to cover job overhead estimated at $30,000, office overhead estimated at $60,000, bond expense estimated at $14,000, taxes estimated at $14,000 and profit estimated at $25,000), from which he arbitrarily deducted $3,000 and then $650 (in order to arrive at a figure ending with the digits 450).

3. The bid of J. B. Ferguson & Co., Inc., which was for the dormitory only, bore a notation as to built-in furniture: "no price received. Add separate prices received by owner in yesterday's bid opening to our base bid." It also bore in Item "C", a notation: "bidder agrees to perform all of the general construction except Built-in Furniture". In calculating the actual Ferguson bid for the Dormitory, the College added to Ferguson's bid of $649,500 the lowest furniture bid received by the College from a supplier the day before, which made the Ferguson bid $732,750.94. The notations made on the Ferguson bid do not support defendant's contention that Ferguson was doubtful as to the interpretation of the provisions of the bid documents with respect to the built-in furniture and kitchen equipment. On the contrary, the notations establish that Ferguson understood that the prices for this special equipment should be included in the Base Bids.

4. (i) They believed that the word "Separate" in the term "Separate Price Quotes" implied that the quotation was separate and apart from the rest of the proposal; (ii) the Form of Proposal contained no provision for deducting the Separate Price Quotes from the Base Proposals, as was provided with respect to the Alternate Proposals, all 15 of which contained the provision "Deduct the sum of _____ ($_____)"; (iii) Item 1(a) of the Separate Price Quotes, as amended by Addendum No. 2, expressly limited that item to furnishing the kitchen and snack bar equipment and expressly removed the word "install", so there no longer was any express provision in the contract documents for the general contractor to do any work under

quotes is unusual in the building industry around Baltimore City, although it is common in certain counties of the State.[5] The Court does not find that such reliance was justified. The Form of Proposal prepared by the Architects was confusing, but it was not uncertain or ambiguous in the sense that it was subject to more than one reasonable meaning. The only reasonable meaning was the one intended by the Architects and the College and recognized by all of the other bidders, namely, that the special equipment items for which Separate Price Quotes were requested, should be included in the Base Price.

Miller's opinion as to the meaning of the proposal was confirmed in his mind by paragraph 24 of Addenum No. 2, quoted above. That paragraph and other items in Addenum No. 2 tend to support his view, and added to the confusion which theretofore existed.

Miller did not seek any interpretation of these provisions from the Architects, although Jenkins called the Architects to inquire why Addendum No. 2 had been issued. Miller and Jenkins were so certain that Separate Price Quotes were generally treated as entirely separate and not deductible items that they did not give much thought to the matter until the bids were opened.

In omitting the special equipment items from its Base Bids, Miller, Inc. did not make a clerical, mechanical or mathematical error. The bids which it submitted were made deliberately, intentionally and not inadvertently. The omission was an honest mistake or misunderstanding, made in good faith, and resulted from Miller's interpretation of the Form of Proposal as meaning that the Separate Price Quotes were not part of the Base Proposals.

The mistake was substantial and material. The omission amounted to $169,000 if based upon the Separate Price Quotes of Miller, Inc. for these items, $160,555 if based upon the lowest quotations which Miller, Inc. received from suppliers. The omission was more than the $140,000 which Miller, Inc. had included in its Base Proposal for overhead, bond expense and profit.[6]

Miller, Inc. was a responsible bidder. It was an experienced contractor and was then engaged in four or five construction jobs. It was financially able to perform its contract with the College, although, if it had done so, it would have suffered a loss.

To a person experienced in the building industry, such as the other bidders or the Architects, it was or should have been apparent that Miller's bid was probably

his Base Proposals in connection with that equipment after the necessary plumbing and electrical roughing-in permit the equipment to be installed by others; (iv) Item 1(b) of the Separate Price Quotes, as originally proposed and as amended by Addendum No. 2, contained the express provision, "NOTE: This cost shall not be a part of this contract"; and (v) Item 2(a) of the Separate Price Quotes contained the express provision "noted as N.I.C. [meaning 'not in contract'] on the drawings", and the drawings contained the notation "N.I.C. [meaning not in contract]".

5. Defendants also offered in evidence three "Dodge Reports", issued by the leading national reporting service for the construction industry on July 10, July 24 and July 26, 1961, all of which carried the

notation "GC [meaning general contract] incls all trades except kitchen equip & built in furniture". Plaintiffs objected to the admissibility of this evidence, because no one from the Dodge organization was offered for cross-examination. The evidence was taken subject to exception; the objection is now sustained, and the reports are not admitted in evidence. Moreover, the Court finds from the testimony and other evidence that Miller did not rely on the Dodge Reports, although they may have served to lull him.

6. Miller, Inc. had included a figure of $25,000 for profit. It was faced with a loss if it were required to construct the two buildings, including the kitchen and snack bar equipment and built-in furniture, for the sum of $1,389,450.

the result of some error or mistake; it was $89,000 lower than the next lowest bid, and the next four were within a spread of $20,000.

On the other hand, the representatives of the College other than the Architects did not realize that there was a material error in the bid.[7]

Byers, the representative of Miller, Inc. at the opening of the bids, telephoned Jenkins an hour or so later, and gave him all bid figures.

The governing body of the College met later that afternoon, August 8, and adopted resolutions to accept Miller, Inc.'s Base Proposal A to construct both buildings for $1,389,450. Ruppert, one of the Architects, was instructed to notify Miller, Inc. promptly of the acceptance of its bid, in order that the construction contract might be signed on Friday, August 11. The reason for the hurry was to avoid a labor cost increase effective at midnight August 11, applicable to any contract entered into after that date. Ruppert reached Miller by telephone the next morning, August 9, and told him that his combined bid for both buildings was low and had been accepted by the College, and that the College wanted the construction contract to be signed on August 11. Miller said that he thought Ferguson was the low bidder on the dormitory, but Ruppert pointed out that the Ferguson bid was not low, because it required the addition of the built-in furniture. Miller then said that he had left the built-in furniture out of his Base Bid and that he could not then agree to sign the proposed contract. Ruppert replied that Miller should come to the College on Friday prepared to sign the construction contract and, if he was not willing to do so, he should bring his attorney with him. The College never gave Miller written notice of the acceptance of its bid, although the bid bond required written notice.

Miller thereupon called his surety's agent, who advised him to withdraw the bid. The next day, August 10, on the advice of its lawyer, Miller, Inc., sent a telegram to the Architects, stating that it was giving formal notice of the withdrawal of its Bid Proposal and that a letter would follow. On the same day Miller, Inc. sent a letter to the Architects stating that it had interpreted the Form of Proposal to mean that the Separate Price Quotes were not to be included in the Base Proposals, so its Base Proposals did not include the kitchen and snack bar equipment in the amount of $84,000 and the built-in furniture in the amount of $85,000, and notifying the Architects and the College that it "is withdrawing its bid".

On August 11 Miller attended a meeting with the Architects and representatives of the College, who demanded that Miller, Inc. sign that day a contract to construct both buildings for the sum of $1,389,450, including the equipment referred to in the Separate Price Quotes. This Miller refused to do. The College refused to allow Miller any further time to study the matter, in spite of the facts that Miller requested such opportunity and the Form of Bid required Miller to sign a contract within ten days after written notice of the acceptance of its bid.[8] The Architects and the College demanded that Miller sign the contract that day, August 11, so that if he refused to sign they might award the contract to the next lowest bidder or bidders without readvertising, which would have been necessary because of the increase

7. The College had received a written estimate from its Architects that the cost of the buildings would be $1,350,000, aside from Architects' fees and other items not included in the bidding documents. The bid of Miller, Inc. for the construction of both buildings was $88,614 (or 6%) less than the next lowest bid. Its bid for the Student Union Building only was

$734,450 as compared with the next lowest bid, $765,000, by Henry A. Knott & Co. The bid of Miller, Inc. for the Dormitory Building was $659,450 as compared with the next lowest bid, $700,064, by Frederick Construction Co., Inc.

8. See note 1.

in labor rates if the contracts had not been signed on that day.

After Miller refused to sign the contract, the College awarded contracts to the next lowest bidders—Henry A. Knott & Co., on its bid of $765,000 for the construction of the Student Union Building, and Frederick Construction Co., Inc., on its bid of $700,064 for the construction of the Dormitory Building. HHFA required the College to increase its financial participation from $420,000 to $490,000.

### Discussion

Since jurisdiction of this action is based on diversity of citizenship, the substantive law applicable in this case is the law of Maryland, where the contract was made and to be performed. Procedural questions are governed by Federal law.

No case precisely in point decided by the Court of Appeals of Maryland, or by any other court, has been cited or found. But the general principles which must control this case are set out and discussed in Baltimore v. DeLuca-Davis Construction Co., 210 Md. 518, 124 A.2d 557 (1956).

In that case DeLuca-Davis had submitted to the City a bid of $1,796,064.25, which by reason of a clerical, material and palpable error, made in good faith, was at least $589,880 less than it was intended to be and some $700,000 less than the engineer's estimate and the next lowest bid. Before the bid was accepted by the City, DeLuca-Davis filed a bill in equity (a) to reform or (b) to rescind its bid. The Court of Appeals refused reformation, but held that DeLuca-Davis

was entitled to cancellation of its bid and the return of its deposit.

The unanimous opinion of the Court, written by Judge Hammond, analyzed a great many decisions from Maryland and other states and the views expressed in Williston, Corbin, Black, and the Restatement, Contracts, and stated:

"Although reformation requires that the mistake be mutual, rescission may be granted whether the mistake be that of one or both of the parties." 210 Md. at 526, 124 A.2d at 561.

Most importantly for the purposes of the instant case the Court said:

"The general rule as to the conditions precedent to rescission for unilateral mistakes may be summarized thus: 1, the mistake must be of such grave consequences that to enforce the contract as made or offered would be unconscionable; 2, the mistake must relate to a material feature of the contract; 3, the mistake must not have come about because of the violation of a positive legal duty or from culpable negligence; 4, the other party must be put in statu quo to the extent that he suffers no serious prejudice except the loss of his bargain." 210 Md. at 527, 124 A.2d at 562.

In support of that rule the Court cited a number of Maryland cases, including Kappelman v. Bowie, 201 Md. 86, 93 A. 2d 266 (1952).[9] The Court further noted:

"There are numerous cases in many states that have granted contractors cancellation of bids based

9. Kappelman v. Bowie, 201 Md. 86, 93 A. 2d 266 (1952), was a suit in equity for specific performance of a real estate contract repudiated by the vendors on the ground of mistake and inadequacy of price. Speaking through Judge Henderson, the Court of Appeals said:

"It has long been established in Maryland that a unilateral mistake as to the terms of a contract of sale may be a defense to a suit for specific performance. Kraft v. Egan, 78 Md. 36, 26 A. 1082; Sommerville v. Coppage, 101 Md.

519, 61 A. 318; Henneke v. Cooke, 135 Md. 417, 109 A. 113; Samuel v. Cityco Realty Co., 141 Md. 27, 118 A. 124; Gross v. Stone, 173 Md. 653, 197 A. 137; Clark v. Kirsner, 196 Md. 52, 74 A.2d 830. These cases seem to be in accord with the law as laid down in other states. See Restatement, Contracts, § 367 (c); Williston, Contracts (Rev. Ed.) § 1427; Pomeroy, Equity Jurisprudence (5th Ed.) § 860; note 65 A.L.R. 7, 97. The defense has been sustained, despite the fact that there was

on clerical, material, palpable, bona fide mistakes. Where, as in the case at bar, the mistake has been brought to the attention of the contracting authority before the acceptance of the bid, the courts have been almost unanimous in granting relief. * * Some courts have decided against the contractor on the facts, such as the lack of materiality of the mistake or the gross or culpable negligence of the bidder, but where the essential factual prerequisites have been found to be present, there is no substantial authority denying rescission for unilateral mistake except in Massachusetts. * * * In most of the cases cited below the contractor was found not to have violated a positive legal duty or to have been guilty of culpable negligence because the mistake was made in the haste and pressure of preparing the bid or was natural in the conduct of the business. See 3 Pomeroy's Equity Jurisprudence, 5th Ed., Sec. 856b. The application of this standard of negligence has been recognized by this Court. See Hoffman v. Chapman, 182 Md. 208, 213, 34 A.2d 438; and Kappelman v. Bowie, 201 Md. 86, 93 A.2d 266, both supra." 210 Md. at 528, 529, 124 A.2d at 562, 563.

The Court refused to follow Baltimore v. J. L. Robinson Construction Co., 123 Md. 660, 91 A. 682, L.R.A.1915A (1914). In that case the City had awarded a contract to a bidder who had advised it before the bid was opened and again before it was accepted that it was $11,000 less than was intended because an error had been made in putting down one item at $952.13 when it should have been $11,-952.13. The bidder refused to execute the contract, the City readvertised and forfeited the $500 deposit, and the bidder sued at law to recover the amount of the deposit. The Court of Appeals held that the bidder could not prevail, principally because of a provision in the City Charter which warned the bidder that his bid was irrevocable. The Court also noted that the action was at law and that all of the cases relied on by the bidder were cases in equity, and that in most of them no statute was involved.

In the DeLuca-Davis opinion, the Court distinguished the Robinson decision on the ground that in Robinson the bidder had the capacity to perform, whereas DeLuca-Davis did not, but placed the greatest emphasis on the fact that Robinson was an action at law, whereas De-Luca-Davis was a suit in equity. Judge Hammond said: "The Robinson opinion shows clearly that the form of the action, the circumstances that it was at law, was important, if not decisive in the result." 210 Md. at 533, 124 A.2d at 565. And again: "The Court in the Robinson opinion gave definite indication that if equitable relief had been sought, the rules of decision might well have been different. It said: 'If the contract were made by the bid and acceptance the bidder then would be compelled to carry it out or be responsible for it, unless a *court*

more or less negligence in the party setting it up. It is true that in some cases, such as Caplan v. Buckner, 123 Md. 590, 91 A. 481, relief has been denied where the evidence did not show a bona fide or material mistake.

"The appellant contends, however, that even if the appellees made a mistake induced by a misrepresentation of their own agent, it would not be a defense if not induced by the opposite party. The contention overlooks the true basis for the rule, which is rooted in the proposition that equity may refuse the extraordinary remedy of specific performance where to do so would enforce a hard bargain, at least where the mistaken party was not grossly negligent and the opposite party would not be prejudiced except to the extent of losing a windfall. It may be that this recognition of a unilateral mistake as a defense is inconsistent with the objective theory of contracts, to the extent that it permits the rescission of an executory contract on equitable grounds. Cf. Williston, Contracts (Rev. Ed.) § 1579. Whether it would be a good defense in an action at law under a plea on equitable grounds, is a question we need not now consider." 201 Md. at 89, 90, 93 A.2d at 267, 268.

*of equity,* for sufficient cause, should relieve him, by rescinding the contract.'" (Emphasis supplied by Judge Hammond.) 210 Md. at 534, 124 A.2d at 566. Rule 1, F.R.Civ.P., unified law and equity procedures in the Federal Courts.

The opinion in DeLuca-Davis concluded the discussion as follows:

> "If it be conceded that in the posture of the case as it came to the Court, the Robinson decision was sound in holding that a bidder could not withdraw his bid at will and was bound by his obligation as long as it was legally unrevoked, we agree with the views of the Court in the McGraw case, from which we have quoted above, that the proper effects of the charter requirements are to assure the municipality that a bidder will be relieved of his obligation only when it is legally justifiable, and that it is legally justifiable when a court of equity is satisfied by clear, cogent and convincing proof that an honest, clerical or mechanical error, not the result of gross or culpable negligence, made the bid that of the bidder in form only but not in actual intent or substance, and the gain of the other party would be unconscionable if advantage were taken of the mistake and the loss would only be that of the bargain if the mistake were nullified. In such circumstances, the blundering bidder may be relieved in equity of his obligation created at law by his bid and deposit, and this is true even though the bid was submitted to a public body under a statute declaring the bid to be irrevocable and providing for the forfeiture of the deposit." 210 Md. at 535, 124 A.2d at 566.

The McGraw case referred to by Judge Hammond was State of Connecticut v. F. H. McGraw & Co., D.Conn., 41 F.Supp. 369 (1941). In that case, Circuit Judge Clark, sitting as District Judge, after noting that "McGraw's bid purported to conform to the specifications", said: "The issue therefore really involves contrary interpretations of the specifications, rather than an offer differing from that called for." 41 F.Supp. at 371. The bidder's mistake was bona fide and was known to the state officials before they accepted the bid. Judge Clark followed the rule of Geremia v. Boyarsky, 107 Conn. 387, 140 A. 749, when the Court had said:

> "The mistake of the defendants was of so fundamental a character that the minds of the parties did not meet. It was not, under the circumstances, the result of such culpable negligence as to bar the defendants of redress, and the plaintiff, before the contract was signed, had good reason to believe that a substantial error had been made, and, while the contract was still executory, and he had been in no way prejudiced, refused to permit the correction of the error, and attempted to take an unconscionable advantage of it. The defendants were clearly entitled to a decree canceling the contract." [10]

After discussing Moffett, Hodgkins & Clarke Co. v. Rochester, 178 U.S. 373, 20 S.Ct. 957, 44 L.Ed. 1108 (1900), Judge Clark said:

> "The only other distinction offered is that in the Geremia and Rochester cases the error was arithmetical, whereas here it is based on an incorrect reading of specifications in the light of the state engineer's

10. Judge Clark added:
"It is objected that the rule should be different where, as here, there is a proviso forbidding the withdrawal of bids. To be sure, this puts a bidder on notice that there is a certain finality about bidding for a government contract. But this by no means should enable a governmental agency to take an unconscionable advantage of its special status as a government body. 'It is axiomatic that the Government must be held to the same general principles of equity and fair play in dealing with those who contract with it as are the contractors themselves.' Kemp v. United States, D.C.Md., 38 F.Supp. 568, 570. * * *" 41 F.Supp. at 373–374.

requirements. The distinction seems artificial. In either event the bidder errs; in either event he is to a degree negligent. But in both, the offeree is aware of the error, and presses his advantage unfairly if he insists on the work at an inadequate price.

"Of course, it is obvious, as the State contends, that the system of public bidding, developed by experience and usual in public contracts, should not be broken down by lightly permitting bidders to withdraw because of change of mind. Such a course would be unfair to other straight-forward bidders, as well as disruptive of public business. But it can hardly be a substantial impairment of such system to grant the relief—which would clearly be given as between private citizens—in a case where a bona fide mistake is proven and was known to the State before acceptance or any loss to it." 41 F. Supp. at 374.

The McGraw case, cited with approval by the Maryland Court in DeLuca-Davis, answers the College's argument that rescission should be denied in the instant case because the mistake was not a clerical, mechanical mistake, but a mistake in the interpretation of the specification. The College contends that the mistake was a "mistake of judgment", and therefore not such a mistake as would justify relief, citing M. F. Kemper Constr. Co. v. Los Angeles, 37 Cal.2d 696, 235 P.2d 7 (1951). The Kemper case, which was cited in DeLuca-Davis on another point, said that there is a difference between a mistake in tabulating and transcribing figures and "errors of judgment, as, for example, underestimating the cost of labor or materials." 37 Cal.2d at 703, 235 P.2d at 11. The mistake in the instant case was not such an "error of judgment".

The College argues that Kappelman, DeLuca-Davis and McGraw are distinguishable from the instant case because in each of those cases the mistake was palpable, and because in the instant case Miller, Inc. was negligent in failing to clarify its confusion or uncertainty with respect to the specifications by asking the Architects for an authoritative interpretation.

Taking the latter point first, the Court finds that Miller, Inc. was negligent in failing to take the matter up with the Architects, and in relying on Miller's construction of the confusing though not ambiguous specifications; but the Court finds that Miller, Inc. was not guilty of gross or culpable negligence. Relief should not be denied because there was "more or less negligence", Kappelman, supra, nor because Miller was "to a degree negligent", McGraw, supra, since the mistake was not the result of "culpable negligence", DeLuca-Davis, supra.

On the question whether the mistake was palpable, the Court has found as a fact that the mistake was obvious, i. e. legally palpable, to the contractors present, when the bids were opened, and was or should have been obvious to the Architects, though not to the other representatives of the College. The Court doubts whether palpability is an essential element of relief in such a case as this; [11] if it is, the College is charged with the knowledge of its Architects.

More importantly, the College knew of the mistake when Miller, Inc. sought to withdraw its bid, before the College had accepted the bid in writing, as it was required to do by the terms of the bid bond before it could hold Miller, Inc. or its surety liable thereunder. It is not necessary to decide whether the withdrawal of the bid was such a breach as excused the failure of the College to give written notice of acceptance, in view of the continued insistence of the College that Miller, Inc. sign the contract on Friday, August 11, a week before it was

11. Corbin on Contracts, 1960 ed., vol. 3, sec. 609; the fact that the mistake was palpable was not one of the grounds of decision relied on in DeLuca-Davis.

required to sign by the Instructions to Bidders, the Form of Bid and other relevant documents. The College knew of the mistake in time to be able to sign contracts with the next highest bidders, without loss of the favorable wage scale, for the amounts of their respective bids. The College lost nothing except the bargain which it would have obtained as a result of Miller's bona fide mistake.

■ The fact that the loss to Miller, Inc. would probably not have been so great as to put it out of business is an element to be considered, but it is not controlling. The mistake was substantial and material.[12]

This Court is aware of the importance of preserving the integrity of the system of competitive bidding. See Glamorgan Pipe & Foundry Co. v. Washington Suburban Sanitary Commission, D.Md., 183 F.Supp. 840 (1960). Cf. Kemp v. United States, D.Md., 38 F.Supp. 568 (1941). But, as Judge Clark concluded in McGraw, to grant relief in this type of case will not result in any substantial impairment of the system.

## Conclusion

■ The evidence meets the four tests specified by the Maryland Court of Appeals in DeLuca-Davis as "the conditions precedent to rescission for unilateral mistakes", quoted above from 210 Md. at 527, 124 A.2d at 562: The mistake was of such grave consequences that to enforce the contract would be unconscionable; the mistake was material; the mistake did not result from violation of a positive legal duty or from culpable negligence; and there was no change in statu quo to the extent that the College suffered any prejudice except the loss of its bargain.[13]

Judgment will be entered in favor of the defendants, with costs.

12. Corbin, op. cit., sec. 609.

13. It is unnecessary to discuss the question of damages.